No. 24-1277

UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

JESUS ZAMBRANO,

Plaintiff-Appellant

v.

CITY OF JOLIET,  et. al.

Defendants-Appellees

Appeal from the United States District Court
for the Northern District of Illinois
1:21-cv-04496
The Honorable Steven C. Seeger, . District Judge

BRIEF AND REQUIRED SHORT APPENDIX OF
PLAINTIFF-APPELLANT

Stephen L. Richards
Joshua S.M. Richards
Attorneys for the
Plaintiffs-Appellants
53 West Jackson Suite 756
Chicago, IL 60604
773-817-6927

ORAL ARGUMENT REQUESTED

RULE 26.1 DISCLOSURE STATEMENT OF STEPHEN L. RICHARDS

1.  Party  represented: Jesus Zambrano

1.              Attorneys who have appeared for these parties:

                        Stephen L. Richards
                        Joshua S.M. Richards

2.              No. 1:21-cv-04495

3.              Date: 7/23/2024

            /s/ Stephen L. Richards

            Stephen L. Richards
            53 West Jackson Suite 756
            Chicago IL 60604

            Tel:    773-817-6927
            Fax:    773-634-8107
            e-mail:       sricha5461@aol.com

            Counsel of record pursuant to Circuit Rule 3(d)

# TABLE OF CONTENTS

DISCLOSURE STATEMENT…........................................................................ ii

TABLE OF CONTENTS ..............................................................................iii

TABLE OF AUTHORITIES .......................................................................... iv

JURISDICTION............................................................................................1

ISSUE PRESENTED FOR REVIEW ............................................................ 2

STATEMENT OF THE CASE…....................................................................3

SUMMARY OF ARGUMENT ..................................................................... 12

ARGUMENT ............................................................................................... 13

THE DSTRICT COURT ERRED BY GRANTING
DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT…………………………………………………………………………..13

Standard of Review..............................................................………..13

CONCLUSION...................................................................................…..…20

CERTIFICATE OF TYPE VOLUME…..........................................................21

REQUIRED SHORT APPENDIX… ..............................................................22

# TABLE OF AUTHORITIES

*Cases*

*Alexander v. Wis. Dep't of Health & Family Servs*.,

263 F.3d 673 (7th Cir. 2001) ......................................................14

*Armstrong v. Daily*, 786 F.3d 529  (7th Cir. 2015)………………………………………..14

*Avery v. City of Milwaukee*, 847 F.3d 433 (7th Cir. 2017)………………………..14, 17-18

*Anderson v. Liberty Lobby,* Inc., 477 U.S. 242 (1986) ...................................................... 13

*Boseman v. Upper Providence Twp*., 680 F. App'x 65 (3d Cir. 2017)……………………16

*Brown v. City of Chicago*, 18 C 7064,  (N.D. Ill. Sep. 30, 2022)…………………………17

*Coleman v. City of Peoria, Ill*., 925 F.3d 336 (7th Cir. 2019)……………………………14

*Dunn v. Menard, Inc*., 880 F.3d 899 (7th Cir. 2018)……………………………,................ 13

*FKFJ, Inc. v. Vill. of Worth*, 20-2396 (7th Cir. Aug. 26, 2021)........................................... 13

*Jones v. York*, 34 F.4th 560 (7th Cir. 2022)………………………………………………...19

*Morgan v. Harris Trust Sav. Bank of Chicago*, 867 F.2d 1023 (7th Cir. 1989),………….15

*Patrick v. City of Chicago*, 974 F.3d 824 (7th Cir. 2020)…………………………………17

*Paulsen v. Olsen*, 3:22-cv-50111,  (N.D. Ill. Nov. 20, 2023)………..……………………15

*People v. Herndon*, 2015 IL App (1st) 123375……………………………………………

*Reeves v. Sanderson Plumbing Prods*., 530 U.S. 133  (2000) ............................................. 14

*Spreen v. Brey*, 961 F. 2d 109 (7th Cir. 1992)……. ...........................................................13

*St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993)..................................................... 13

*Stumph v. Thomas & Skinner, Inc*., 770 F.2d 9m (7th Cir. 1985)....................................... 14

*Weaver v. Champion Petfoods USA Inc*., 3 F.4th 927 (7th Cir. 2021) ...............................13

*Whitlock v. Brueggemann*, 682 F.3d 567 (7th Cir. 2012)………………………………...14

*Wolf v. Buss America Inc.*, 77 F.3d 914 (7th Cir. 1996)…………………………………….13

**Statutes**

28 U.S.C. §1291 ................................................................................ 1, 2

28 U.S.C. §1294 ................................................................................ 1,2

28 U.S.C. § 1331 ............................................................................... 1,2

28 U.S.C. § 1343 ............................................................................... 1,2

42 U.S.C. § 1983……………………………………………………………1,2

**Rules**

Federal Rules of Appellate Procedure, Rule 4(b) ..................................................... 1,2

**JURISDICTION**

This proceeding was commenced as a civil rights complaint under 42 U.S.C. § 1983. The district court had jurisdiction over the complaint pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (4). (Dkt # 1). The district court granted summary judgment for the defendants on February 9, 2024. (Dkt # 93). Notice of appeal was timely filed on February 21, 2024. (Dkt # 95). Appellate jurisdiction is conferred upon the United States Seventh Circuit Court of Appeals pursuant to 28 U.S.C. §1291, 28 U.S.C. §1294(1), and Federal Rules of Appellate Procedure, 4(b). This brief is currently due on July 23, 2024.

## ISSUE  PRESENTED FOR REVIEW

Whether the district court erred by granting defendants'' motion for summary judgment.

## STATEMENT OF THE CASE

The following facts are drawn from the district court's opinion (A-3-23) and from the relevant pleadings.

### *The Murder*

The case is about a murder that took place in 2009, and the two trials that followed.

In the early morning hours of May 22, 2009, the Joliet Police Department received word of a minutes-old murder. (A-6).

Someone shot and killed Robert Gooch at his girlfriend's apartment. Gooch's girlfriend, Elissa Hinton, lived in the Larkin Apartments complex. (A-6).

Hinton was home when Gooch was murdered. She was asleep at the time, and the apartment buzzer startled her awake. Gooch got out of bed to answer the door. (A-6).

Then Hinton heard Sanchez's voice: "It was my girl." A shot rang out. Hinton went into the living room and found Gooch lifeless on the floor. (A-7).

Before long, the Joliet Police Department put several officers on the case, including Detective Patrick Schumacher. On the afternoon of the murder, Detective Schumacher and five other officers went to the home of Plaintiff Jesus Zambrano to investigate. (A-7).

Jesus was home, with his mother. Pedro Sanchez and another man, Michael Ortiz, were also there. Detective Schumacher and Jesus talked. (A-7).

According to Detective Schumacher, Jesus gave some details about where he was, and who he was with, on the afternoon before the murder. Jesus allegedly admitted to the officer that he was with Pedro Sanchez and Michael Ortiz on the afternoon before the murder. And he allegedly admitted that they were at a specific location. (A-7).

As the detective later retold it, Jesus said that "in the afternoon hours of May 21, 2009, he was with his friends, Pedro Sanchez and Michael Ortiz at Claudia Sanchez's residence

located near the area of Ruby St. and the westside of the Des Plaines River." (A-7-8). Jesus admits that he was, in fact, at Claudia Sanchez's house with Pedro Sanchez and Michael Ortiz on May 21, meaning the day before the murder. Jesus also admits he was "drinking beer and smoking marijuana while at Claudia's residence." But according to Jesus, he did not give those details to Detective Schumacher. He did not name names, and he did not tell Detective Schumacher how to find Claudia Sanchez's house on a map. (A-8).

Later that day (still May 22), Detective Schumacher interviewed Ms. Sanchez at her apartment. Ms. Sanchez confirmed that Zambrano spent time at her apartment the day before (May 21), along with Pedro Sanchez, Michael Ortiz, and someone else – Christian Lopez. Ms. Sanchez's roommate gave the same account. (A-8-9).

### *The Lopez Interview*

Detective Schumacher interviewed Christian Lopez at 10 p.m. that night. Supposedly, Lopez "confirmed" Jesus's "involvement in the murder of Robert Gooch." Lopez told Detective Schumacher (and eventually the jury) the following story. (A-9).

According to Lopez, he hung out with Jesus, Sanchez, and Ortiz at Ms. Sanchez's home. Lopez "confirmed that he was with Plaintiff, Pedro Sanchez and Michael Ortiz at Claudia's house where they were drinking and smoking marijuana." (A-9).

Lopez claimed that Jesus drove the group (meaning Lopez, Pedro Sanchez, and Ortiz) to McDonald's. And then the group drove to the Larkin Apartments. (A-9).

Once the group reached the apartment complex, Lopez saw Jesus get a gun from the car's hood. Lopez, Sanchez, and Jesus went into the building. Lopez stood at the bottom of the stairwell. But Sanchez and Jesus climbed up three floors. (A-9).

Lopez heard a gunshot. Then he saw Jesus and Sanchez run down the stairs to the car. (A-9).

Back outside, Lopez saw Jesus put the gun back under the car's hood. Jesus drove

everyone back to his house, where they spent the night. (A-10).

### *The Police Report*

On May 23, 2009, at 2:35 a.m. Detective Schumacher prepared a police report. (A-10).

According to the police report, Jesus admitted that he was with Pedro Sanchez and

Michael Ortiz the day before the murder, and admitted the specific location:

> "On 5/22/09 at approximately 1500 hrs I had the following conversation
> with Jesus Zambrano in essence and not verbatim. Zambrano asked me why
> we wanted to speak with him and I advised him that his name had come up
> in an investigation and I asked him where he was last night. Zambrano
> stated to me that he was with his friends, PEDRO and MICHAEL. (It
> should be noted Pedro Sanchez and Michael Ortiz were present at the
> Zambrano's residence when we made contact with Zambrano and his
> mother). Zambrano stated to me that he, Pedro, and Michael had gone to a
> girl's house by the name of CLAUDIA who had lived somewhere in the
> area of Ruby St. near the Westside of the Desplaines River."

(A-10).

### *The Arrest*

Three days later, the Joliet Police Department obtained a warrant for Jesus's arrest. (A-10).

The Department relied on Lopez's story. (A-10).

On May 26, officers went to Jesus's home to arrest him. He wasn't home, but his mother

was there. She told the officers that Jesus would "turn himself in." But Jesus never showed up at

the police station. (A-11).

Instead, officers received word that Jesus, his mother, and his grandmother had fled the

residence in a red vehicle The Department entered the vehicle's information into a database,

alerting officers across the United States to keep an eye out for the car. (A-11).

On May 28, a Texas state trooper spotted the vehicle. The trooper pulled it over. The

male occupant told the trooper that he did not have identification, and that his name was "Juan."

(A-11).

The trooper ran the man's fingerprints, and the trooper figured out that Juan was really

Jesus Zambrano.  So, the trooper arrested Jesus. (A-11).


### The First Trial

The state charged Jesus  with first-degree murder.  (A-12).

During a pre-trial hearing, Jesus's  counsel seemed to acknowledge Zambrano's conversation with Detective Schumacher.  Counsel told the state court that Zambrano had made a brief statement "where he indicated that he was with his friends, Pedro and Michael. Jesus then stated that they had gone to a girls house name[d] Claudia who lived somewhere around Ruby Street on the west side of the Des Plaines River."  (A-11).

At trial, the state called seventeen witnesses to the stand.  Detective Schumacher testified.  So did Lopez, the state's star witness.  (A-12).

The district court omitted from its opinion the following uncontested facts about Schumacher's interactions with the prosecutor before he testified.

Both Schumacher and Assistant States Attorney Walsh, the lead prosecutor in Jesus Zambrano's first trial, were deposed. Defendant Schumacher identified a document marked as Exhibit A in his deposition as the police  report he generated during the investigation of the murder of Robert Gooch.  Defendant Schumacher could not recall whether he kept a copy of his report  but  had no reason to believe that the States Attorney who put him on to testify did not have a copy of Schumacher's report. (Dkt # 87, 22).   He also  admitted that generally  it is his practice to meet or speak with a States Attorney before he testifies.  In his deposition, Shumacher stated had no independent recollection of meeting with an Assistant States Attorney before he testified in the Robert Gooch murder case or whether the States Attorney he met with had a copy of his police report.  (Dkt # 87, 23).

And,  according to Daniel M. Walsh, the lead prosecutor at Jesus Zambrano's first trial, it is part of his procedure to receive police reports in the cases that he tries.   To prepare police

officers to testify, Walsh would typically meet with police officers at his office ahead of time or he would talk with them on the phone.  Walsh could not recall any murder case in which he put a police officer on the stand without speaking with him first.   Walsh conceded that it would be poor idea to put a police officer on the stand without speaking with him first. .  (Dkt # 87, 23). And Walsh also conceded that he generally relied upon the accuracy of police reports when putting officers on the stand to testify. (Dkt # 87, 24).

Walsh also conceded that he very familiar with defendant Patrick Schumacher   and that Patrick Schumacher was one of the witnesses who testified in Jesus Zambrano's first trial.  (Dkt # 87, 24).

Although Walsh had no specific memory of speaking with Schumacher before he testified, he had no reason to believe that he did not  speak with  Schumacher  before Schumacher testified.  (Dkt # 87, 24).

Walsh reviewed Patrick Schumacher's report in the Robert Gooch murder case and although he did not specifically remember reviewing the report before Schumacher testified he was virtually certain that he would have reviewed that report. Walsh was virtually certain that this was the  report he would have reviewed before he put Patrick Schumacher on the stand. To the best of Walsh's belief, the information that Patrick Schumacher put in his report and whatever Walsh told him before he testified is the information he used and was guided in in terms of presenting Schumacher's testimony.  (Dkt # 87, 24).

Among other things, Detective Schumacher testified about the underlying facts in his police report.  He told the jury about his conversation with Jesus  on May 22.  (A-12).

Specifically, Detective Schumacher testified that Jesus  had given him details about where he was, and who he was with.  The testimony tracked the arrest report:

Q:      And did you ask him any questions?

A:      Yes, I asked him where he was the night prior.

Q:      So, that would have been the evening of May 21, 2009?

A:      Yes.

Q:      Did he answer that question?

A:      Yes.

Q:      What did he tell you?

A:      He stated that he was with Miguel Ortiz and Pedro Sanchez and that they had left from his residence and went to a female's residence who he names . . . who he knew as Claudia, who lived off Ruby Street near the west side of the Des Plaines River.

The prosecutor "had no reason to believe that Detective Schumacher's police report" or "testimony was false." (A-12).

Although the prosecution did not admit the police report into evidence, Detective Schumacher testified about the substance of his interview with Jesus on May 22. (A-12).

The jury also saw surveillance videos from McDonald's and the Larkin Apartments.  (A-12).

The McDonald's video showed Jesus  pull through the drive thru between 12:36 a.m. and 12:40 a.m. on May 22. In this suit, Jesus  admits that he drove to  McDonald's, and admits that he is the driver in the McDonald's video. (A-13). But he also has testified that he was dropped off after the trip to McDonald's and did not travel on with the others to the apartment complex where the murder took place.

An apartment complex surveillance video shows Jesus's sedan pulling up not much later, at 12:47 a.m.  An officer testified that the apartment complex was a 5-to-10-minute drive from the McDonald's. (A-13).

The video shows the driver pull up, got something from under the car's hood, and walk toward the building, alongside two of the passengers. The men return  to the car at 12:51 a.m. The driver runs  across the grass, puts  something back under the car's hood, and pulls  away. (A-13).  It was apparently disputed as to whether the driver in the apartment complex

surveillance video was Jesus.

During deliberations, the jury asked to see the surveillance videos and photographs. (A-13). Then the jury announced its verdict: guilty. Jesus appealed. (A-13).

### The Appeal

On appeal, Jesus made two arguments. He challenged his conviction on the ground that counsel failed to impeach Lopez with evidence that he received immunity to testify, and that the state court did not instruct the jury about accomplice liability. (A-13).

he Appellate Court of Illinois sided with Jesus It reversed the judgment and remanded, based on the missing jury instruction. According to the appellate court, the missing instruction deprived the jury of "critical information it needed to evaluate Lopez's testimony." (A-14).

### The Second Trial

At the second trial, essentially the same evidence was admitted. (A-14).

Detective Schumacher again testified Jesus told him that on the night of the murder, he "was with several friends" – "Pedro Sanchez and Miguel Ortiz" – and that they had "gone to a girl's house named Claudia near the area off of Ruby Street, just west of the Des Plaines River." The second jury also asked to see some evidence during deliberations. Among other things, it wanted to see the apartment surveillance videos and Lopez's trial transcript. (A-14).

Then the jury announced its verdict: not guilty. (A-14).

### The Federal Lawsuit

With the first-degree murder charge behind him, Jesus filed a lawsuit of his own. The complaint contained two counts. (A-14).

The first count was a due process claim under the Fourteenth Amendment against Detective Schumacher. The complaint alleged a "fabrication of a false statement allegedly made by" Jesus. (A-14).

Specifically, Jesus alleged that Detective Schumacher "authored a false police report, in which Schumacher claimed that . . . Zambrano admitted he was in the company of acting in concert with Michael Ortiz and Pedro Sanchez, the actual killer." According to the complaint, Schumacher

"conveyed this information to the prosecutors and testified to these false statements at trial." (A-15).

The second count was an indemnification claim against the City of Joliet. (A-15).

. Defendants moved to dismiss the complaint for failure to state a claim. The district court granted the motion in part and denied it in part. The district court granted the motion to the extent that Jesus's claim relied on testimony that Detective Schumacher gave at trial. (A-15).

The district court otherwise denied Defendants' motion to dismiss. (A-15, Dkt # 38). The district court reasoned:

> "The complaint, however, seems broader than the trial testimony. It also appears to cover statements that Defendant Schumacher allegedly made in a police report and/or statements allegedly made directly to prosecutors *** But even if the statements in the report and to the prosecutors weren't directly entered into evidence for the jury, they got the ball rolling toward prosecution. And nothing broke that chain of causation, according to the complaint. In other words, when Schumacher "falsified [his] reports..., it was entirely foreseeable that this fabricated 'evidence' would be used to convict" him at trial. "

(Dkt # 38, 1, 2).

After discovery, Defendants moved for summary judgment. (A-15).

The district court granted the motion for summary judgment. (A-15-23).

The district court rested its decision on two different bases. First, it held that Jesus had failed adequately to support his claim that Schumacher intended to falsify evidence because it was possible Schumacher had made an honest mistake. (A-15-19). Second, it held, contrary to its discussion of causation in its ruling on the motion to dismiss, that the preparation of Schumacher's testimony by the prosecutors was, like his testimony itself, protected by testimonial immunity. (A-19-23).

**SUMMARY OF ARGUMENT**

The district court erred by granting defendants' motion for summary judgment. Judged in the light most favorable to the non-movant, plaintiff Jesus Zambrano presented substantial evidence that defendant Schumacher fabricated a police report claiming that Jesus Zambrano had admitted to being in the company of a group of people who were involved in the charged murder. Schumacher says Jesus made these statements to Schumacher; Jesus denies it. Since issues of intent or motivation can seldom be resolved on summary judgment, the district court erred by finding that there was no triable issue of fact. Even though the police report was not directly admitted into evidence, it was reasonably foreseeable that its contents would be conveyed to the prosecutor and that Jesus would be convicted based upon its contents. Schumacher's testimonial immunity cannot give him license to author a false report. Therefore, it is arguable that Jesus was convicted based upon fabricated evidence, and the motion for summary judgment should have been denied. The district court's decision must be reversed.

# ARGUMENT

## THE DISTRICT COURT ERRED BY GRANTING DEFEEENDANTS' MOTION FOR SUMMARY JUDGMENT

### Standard of Review

This court reviews the district court's grant of summary judgment *de novo*, viewing the facts in the light most favorable to the non-moving party. *FKFJ, Inc. v. Vill. of Worth*, 20-2396, at *1 (7th Cir. Aug. 26, 2021).

Summary judgment is proper only when there is no genuine dispute of material fact, and the moving party is entitled to judgment as a matter of law. *Weaver v. Champion Petfoods USA Inc*., 3 F.4th 927, 934 (7th Cir. 2021). A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Dunn v. Menard, Inc*., 880 F.3d 899, 905 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby,* Inc., 477 U.S. 242, 248 (1986)). A dispute of fact is material if the fact "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248.

On summary judgment, all statements of fact and inferences therefrom are to be considered in the light most favorable to the non-moving party. *Wolf v. Buss America Inc*., 77 F.3d 914, 918 (7th Cir. 1996). Credibility of witnesses can only be assessed at trial. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993). Where a determination of the credibility of witnesses is essential to resolving an issue of material fact, summary judgement is properly denied. *Spreen v. Brey*, 961 F. 2d 109, 111 (7th Cir. 1992).

> "'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.' *Liberty Lobby*, supra, at 255. Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe. That is, the court should give 'evidence

supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.

*Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150-151 (U.S. 2000).

Moreover, summary judgment is "notoriously inappropriate" with respect to such issues as "intent, good faith, and other subjective feelings." *Stumph v. Thomas & Skinner, Inc.*, 770 F.2d 93, 97 (7th Cir. 1985). Put another way, it is only "rarely appropriate on summary judgment for a district court to make a finding on state of mind." *Alexander v. Wis. Dep't of Health & Family Servs.*, 263 F.3d 673, 681 (7th Cir. 2001).

Under de novo review, the district court's decision must be reversed.

The Fourteenth Amendment's Due Process Clause prohibits law enforcement officers from depriving a defendant of a fair trial by knowingly using false evidence, including false testimony, to obtain a conviction. *Avery v. City of Milwaukee*, 847 F.3d 433, 439 (7th Cir. 2017); *Coleman v. City of Peoria, Ill.*, 925 F.3d 336, 344 (7th Cir. 2019). The due process violation occurs where the evidence or law enforcement techniques cause a deprivation of liberty. *Armstrong v. Daily*, 786 F.3d 529, 546 (7th Cir. 2015). In the Seventh Circuit, a claim for fabrication was recognized as early as 2012, if not earlier. See *Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012).

Here, there was a clear factual issue as to whether Defendant Schumacher fabricated the statements which he claimed Jesus made and the district court erred by holding otherwise.

Although the district court's opinion is not entitled to any deference, its reasoning on this point was deeply flawed, and should be rejected by this court.

The district court conceded, as it must, that intent is "often proven circumstantially," that an "admission isn't necessary and neither is a smoking gun. A defendant will rarely raise his hand and say, 'I intended to do something wrong.'" (A-18). Nevertheless, the district court concluded,

14

without further elaboration, that Jesus's sworn testimony that he had not said what Schumacher said he said was insufficient to raise an issue as to Schumacher's intent. According to the district court, all Jesus had established was that Schumacher's report was inaccurate and that was insufficient to disprove the possibility that Schumacher made an honest mistake. "A mistake is different than a lie, and when it comes to a fabricated evidence claim, the difference is everything." (A-19).

This argument would probably have no merit even if Schumacher had testified that he made an honest mistake. But he did nothing of the sort. He maintained that his report was accurate. Jesus said that it was not. Under these circumstances, a reasonable jury could conclude that the reason the report was inaccurate was because it was fabricated, and that Schumacher fabricated it.

The cases cited by the district court do not change this conclusion.

For example, in *Morgan v. Harris Trust Sav. Bank of Chicago*, 867 F.2d 1023, 1026 (7th Cir. 1989), an employment discrimination case, this court held that there was no issue as to intent, but only because the plaintiff failed to allege discriminatory treatment, and his own deposition testimony admitted his "belief that the selection process was neither racially biased nor motivated." 867 F. 2d at 1026. And *Paulsen v. Olsen*, 3:22-cv-50111, at *8 (N.D. Ill. Nov. 20, 2023) was an appeal from a full hearing in which the bankruptcy court found against the appellants. It is unclear why this case was cited by the district court, but the only possibly relevant holding was that summary judgment for plaintiffs was properly denied because summary judgment is ""notoriously inappropriate for determination of claims in which issues of intent, good faith, and other subjective feelings play dominant roles." *Paulsen v. Olsen*, 3:22-cv-50111, at *20 (N.D. Ill. Nov. 20, 2023), citing *Stumph v. Thomas & Skinner, Inc*., 770 F.2d 93, 97 (7th Cir. 1985) and because "genuine disputes of material facts existed as to Mr. Paulsen's sole intent and his ability to pay the debts as they became due, " *Paulsen v. Olsen*, 3:22-cv-50111, at *23 (N.D. Ill. Nov. 20, 2023).

The district court also reached far afield to cite a non-precedential appendix opinion from the Third Circuit, *Boseman v. Upper Providence Twp.*, 680 F. App'x 65, 70 (3d Cir. 2017). The district court's reliance upon this case was misplaced.

In *Boseman*, the Third Circuit upheld the dismissal of plaintiff's complaint where she alleged that the arresting officer fabricated claims in a police report that she had "glassy and blood shot eyes, a red face, and slurred speech." Plaintiff conceded that she may have had a red face, but denied the other claims in the police report.

The Third Circuit found that dismissal of the complaint was proper because it found that the claims of fabrication were too insubstantial and insignificant. But even assuming that *Boseman* was correctly decided, it is obviously distinguishable.

In *Boseman*, the plaintiff's allegation that her eyes were not glassy and blood shot and her speech was not slurred did not establish a factual conflict with the officer's report, since people cannot normally see their own eyes and whether speech can be characterized as "slurred" is subjective. Under these circumstances, the *Boseman* court may have properly concluded that there was an insufficient allegation of fabrication because the officer might have been mistaken, but sincere in his belief that plaintiff's eyes were glassy and blood shot and that her speech was slurred.

But here, the allegation was that Schumaker fabricated statements which Jesus denied making. Under these circumstances it cannot be concluded that no reasonable jury could have concluded that Schumaker was lying, and not mistaken.

In the alternative, the district court reasoned that Schumacher's allegedly false police report did not cause his conviction because the report "did not come into evidence" during trial. (A-19). This conclusion, of course, contradicted the district court's conclusion in its ruling on the motion to dismiss that the false report "got the ball rolling" toward Jesus's wrongful conviction.

The district court based its reasoning upon the decisions in *Brown v. City of Chicago*, ", 18 C 7064, at *1 (N.D. Ill. Sep. 30, 2022) and *Patrick v. City of Chicago*, 974 F.3d 824, 835 (7th Cir. 2020) that the fabrication claims must fail because the fabricated police reports were not "used against" Jesus at trial.

This reasoning turns upon the meaning of "used against." Obviously, the false police report was not actually admitted and shown to the jury. This is no surprise. Under Illinois law, police reports are not evidence. *People v. Herndon*, 2015 IL App (1st) 123375, ¶ 40. It would therefore be highly unusual that an Illinois jury would ever see a police report, particularly a report which was consistent with an officer's inculpatory testimony, rather than impeaching. But that is not the only sense in which a false police report can be "used against" a criminal defendant.

As Defendant Schumacher and Daniel Walsh both conceded, police reports are highly significant in determining the presentation of the prosecution's case. They shape and mold the prosecutor's opening statement and closing arguments, they refresh the recollection of police officers who are required to remember the incidents of multiple investigations over a long period of time, and they are also used to prepare police officers to testify. In these senses, there is at least a factual issue as to whether Schumacher's false police report was "used against" Jesus Schumacher.

On this point, this court's decision in *Avery v. City of Milwaukee*, 847 F.3d 433 (7th Cir. 2017) is dispositive.

In *Avery*, which is directly on point, the Seventh Circuit held that a claim of fabricating false evidence in police reports and statements to prosecutors cannot be immunized merely because the police officers testify to that same false evidence at trial:

> "Here, the detectives testified about [plaintiff's] "confession" and authenticated their false reports memorializing it; the reports were then introduced into the trial record. If an officer who fabricates evidence can immunize himself from liability by authenticating falsified documentary or physical evidence and then repeating the false "facts" in his trial testimony, wrongful conviction claims premised on evidence fabrication would be a dead letter.... When the detectives falsified their reports of a

17

nonexistent confession, it was entirely foreseeable that this fabricated "evidence" would be used to convict Avery at trial for Griffin's murder. That was, of course, the whole point of concocting the confession."

847 F.3d at 441.

Here, similarly, at the time Schumacher authored the false police report, long before he testified or spoke to the prosecutors, it was reasonably foreseeable that the report would play a role in Jesus Zambrano's conviction. The mere fact that the vehicle for the use of the report would be Schumacher's repetition of these false facts in his testimony (or for that matter in his preparation for testimony) cannot immunize Schumacher for liability for the false report. And if it could immunize him, "claims based on evidence fabrication would be a dead letter."

The district court relied upon the unpublished district court decision in *Brown v. City of Chicago*, 18 C 7064, at *1 (N.D. Ill. Sep. 30, 2022) in support of its contention that the mere fact that Schumacher testified consistently with his false report is not sufficient to support a fabrication of evidence claim because the report itself was not introduced into evidence and was not sued to refresh Schumacher's recollection when he testified.

But the facts here are distinguishable from *Brown* because in this case there is deposition testimony which at least raises a question of fact as to whether Schumacher's report was used in preparing him to testify and in shaping and guiding his testimony on the stand. Critically, Walsh testified at his deposition that the information that Patrick Schumacher put in his report and whatever Walsh told him before he testified is the information he used and was guided by when presenting Schumacher's testimony. No similar testimony was presented in *Brown*.

More importantly, to accept *Brown* as good precedent would undercut nearly all fabrication of evidence claims and would expand testimonial immunity so as to enable police officers to convey false information to prosecutors and to juries. As the district court ruled when denying defendants' motion to dismiss: "even if the statements in the report and to the prosecutors weren't directly

18

entered into evidence for the jury, they got the ball rolling toward prosecution. And nothing broke that chain of causation, according to the complaint."

The district court also reasoned, based upon *Jones v. York*, 34 F.4th 560 (7th Cir. 2022) that the use of the police report during the preparation of Schumacher's testimony insulated Schumacher from liability because the preparation of his testimony is covered by testimonial immunity. This is a misinterpretation of *York*.

In *York*, the plaintiff claimed that the defendant falsified various reports, including a report which claimed that a voice on a recording was the voice of the plaintiff. But as this court pointed out, this claim of fabrication was entirely insubstantial, because whether the voice sounded like plaintiff was a subjective judgment, not a falsification, and the jury could listen to the recording and make its own judgment as to whether the voice was the voice of plaintiff. *York*, 34 F.4th at 563. Therefore, as with the subjective judgment in *Boseman* there was no fabrication.

In an attempt to avoid this ruling, the plaintiff in *York* argued that defendant has falsely testified at trial. But that attempt to do an end run around the lack of falsification ran straight into testimonial immunity, and was rejected. *York*, 34 F.4th at 563. And this court distinguished *Avery* on that ground:

> "In other words, police officers cannot purify fabricated evidence by invoking Briscoe 's absolute-immunity rule. Id. As discussed above, although we view the facts in the light most favorable to her, Jones failed to show a genuine dispute of fact as to whether York fabricated evidence. That ends the matter."

*York,* 34 F.4th 550, 563 (7th Cir. 2022).

But here, there was fabrication, foreseeably used at trial. The district court's decision must be reversed.

**CONCLUSION**

For the reasons given, the judgment below should be reversed, and the cause should be remanded for trial.


Respectfully submitted,


JESUS ZAMBRANO,

Plaintiff,

/s/ Stephen L. Richards

By:_____
               Stephen L. Richards
               53 West Jackson Suite 756
               Chicago, IL 60604
               773-817-6927

CERTIFICATE OF COMPLIANCE

I, Stephen L. Richards, attorney of record for appellants certifies that the foregoing brief complies with the type-volume limitation of Rule 32(a)(7) of the Federal Rules of Appellate Procedure in that the brief contains 5,747 words as defined by that rule. In making this certification, counsel relies upon the word count of the word-processing system used to prepare the brief.

/s/ Stephen L. Richards

_____

Stephen L. Richards

**REQUIRED SHORT APPENDIX**

TABLE OF CONTENTS

TABLE OF CONTENTS…………………………………………………………..A-1

JUDGMENT ORDER …………………………………………………………..A-2

MEMORANDUM OPINION AND ORDER………………….…………………..A-3

STATEMENT UNDER CIRCUIT COURT RULE 30(D)………………………… A-25

ILND 450 (Rev. 10/13) Judgment in a Civil Action

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

JESUS ZAMBRANO,

Plaintiff(s),

v.

CITY OF JOLIET, *et al*.,

Defendant(s).

Case No. 21-cv-4496
Judge Steven C. Seeger

## JUDGMENT IN A CIVIL CASE

Judgment is hereby entered (check appropriate box):

☐     in favor of plaintiff(s)
and against defendant(s)
in the amount of $              ,

        which ☐ includes         pre–judgment interest.
        ☐ does not include pre–judgment interest.

Post-judgment interest accrues on that amount at the rate provided by law from the date of this judgment.

Plaintiff(s) shall recover costs from defendant(s).

---

☐     in favor of defendant(s)
and against plaintiff(s)

.

Defendant(s) shall recover costs from plaintiff(s).

---

☒     other:  This Court enters judgment in favor of defendants City of Joliet and Patrick Schumacher and against plaintiff Jesus Zambrano. Civil case terminated.

---

This action was *(check one)*:

☐ tried by a jury with Judge         presiding, and the jury has rendered a verdict.
☐ tried by Judge         without a jury and the above decision was reached.
☒ decided by Judge Steven C. Seeger on defendants' motion for summary judgment.

Date:  2/9/2024

Thomas G. Bruton, Clerk of Court

Jessica J. Ramos, Deputy Clerk

A-002

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JESUS ZAMBRANO, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 21-cv-4496 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| CITY OF JOLIET, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

### MEMORANDUM OPINION AND ORDER

A state court jury found Jesus Zambrano guilty of first-degree murder. Half a decade later, after a successful appeal, Zambrano stood before the jury box a second time for the same murder. The second trial ended with an acquittal.

Zambrano, in turn, filed suit against one of the police officers who investigated the murder. He brought a claim under the Fourteenth Amendment, alleging fabrication of evidence. He also sued the City of Joliet as an indemnitor.

After discovery, Defendants moved for summary judgment. For the following reasons, the Court grants Defendants' motion.

### Non-Compliance with the Local Rules

The Court begins with the starting point for any motion for summary judgment: the Local Rules. The punchline is that Plaintiff Zambrano did not comply with the requirements for how to respond to a statement of material facts.

The Local Rules provide the rules of the road for motions for summary judgment, and responses. The Local Rules exist for good reason. Compliance with the Local Rules is essential, so that district courts can manage the flow of traffic on an overcrowded judicial highway. If

parties believe that they can go their own way, and play by their own set of rules, chaos would break out, and traffic would grind to a halt.

Local Rule 56.1 creates the ground rules for summary judgment. The rule imposes clear requirements for how the parties must present the facts. The moving party must file a statement of material facts, in concise numbered paragraphs. *See* L.R. 56.1(d)(1). The movant must support each fact with a citation to the evidentiary record. *See* L.R. 56.1(d)(2).

The non-movant has a duty to respond to each numbered paragraph. *See* L.R. 56.1(e). The non-movant must "admit the asserted fact, dispute the asserted fact, or admit in part and dispute in part the asserted fact." *See* L.R. 56.1(e)(2).

It is not good enough for the non-movant to say "disputed," and leave it at that. The Local Rules require the non-movant to point to evidence in the record, and explain what it means. "To dispute an asserted fact, a party must cite specific evidentiary material that controverts the fact and must concisely explain how the cited material controverts the asserted fact." *See* L.R. 56.1(e)(3). That way, a district court will see the evidence and hear an explanation.

Here, Zambrano offered half a loaf. Time and again, Zambrano responded to paragraphs in Defendants' statement of material facts by declaring that a fact was "DISPUTED," and then citing a bunch of lines from a deposition, without explanation. Here's a good example, among many others:

> 10.  While at the residence, Defendant Schumacher had a conversation with the Plaintiff. Plaintiff communicated to Schumacher that in the afternoon hours of May 21, 2009, he was with his friends, Pedro Sanchez and Michael Ortiz at Claudia Sanchez's residence located near the area of Ruby St. and the westside of the Des Plaines River. Ex. C, ¶ 9
>
> **DISPUTED  Ex. J., 106:24, 107:1-24, 115:14-24, 116:1-24, 117:1-6, 108:19-24, 109:1-24, 110:1-24, 111:1-19**

*See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 10 (Dckt. No. 87) (bold in original); *see also id.* at ¶¶ 11, 12, 14, 24, 26.

An explanation was nowhere to be found.  Based on the filing, this Court has no idea why Zambrano is disputing the fact in question.  This Court couldn't figure it out without pulling out the deposition transcript, reading the testimony for itself, and then spending the time to figure out why the paragraph is inconsistent with the testimony.

In effect, Zambrano is attempting to reassign work that the Local Rules place on the parties, and putting the work on the Court's plate.  But the Local Rules place the burden on the parties, for good reason.  The parties know the record better than the Court.  They're better positioned to know what the issues are, and what evidence is important.  And at the end of the day, the parties are the ones who have their interests at stake.

Summary judgment is not a game of fetch, where the district court judge is required to chase after the evidence thrown somewhere in the record by the parties.  It is not the job of a district judge to comb through the record and search for evidence that can support an unsupported assertion by a party.  Providing an explanation is the job of the parties.  If the parties don't give an explanation, then a lower court does not have to go on an expedition to hunt for one.

Heaven helps those who help themselves, and the same can be said for litigants.  Parties who do not follow the rules should not expect extra help from the judiciary.  Courts should not have to go out of their way to help parties who do not comply with the rules.

The bottom line is simple.  This Court will consider Zambrano's response to the statement of material facts to the extent that it complies with the Local Rules.  But this Court will disregard any response that fails to "concisely explain how the cited material controverts the

3

asserted fact." *See* L.R. 56.1(e)(3). Any denial without an accompanying explanation is stricken, and the corresponding fact is deemed admitted (to the extent that it is properly supported, that is).

At the end of the day, as explained below, the outcome does not change. Even if this Court accepted the flat denials, there is no genuine issue of material fact.

## Background

### *The Murder*

The case is about a murder that took place in 2009, and the two trials that followed.

In the early morning hours of May 22, 2009, the Joliet Police Department received word of a minutes-old murder. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶¶ 5–6 (Dckt. No. 87); *People v. Zambrano*, 64 N.E.3d 639, 641 (Ill. App. Ct. 2016).

Someone shot and killed Robert Gooch at his girlfriend's apartment. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 5 (Dckt. No. 87). Gooch's girlfriend, Elissa Hinton, lived in the Larkin Apartments complex. *Id.*

The parties do not connect all of the dots when introducing the characters in the story. But by the look of things, Hinton had recently broken up with a man named Pedro Sanchez. *See Zambrano*, 64 N.E.3d at 641.[1]

Hinton was home when Gooch was murdered. *Id.* She was asleep at the time, and the apartment buzzer startled her awake. *Id.* Gooch got out of bed to answer the door. *Id.*

---

[1] That romantic relationship isn't in the record, so it is not a fact, let alone a material fact. Even so, the Court includes the background for storytelling purposes only, to help the reader understand who's who. The same goes for any other citation to the *Zambrano* state-court decision in this opinion, including the next few paragraphs. It greases the wheels of storytelling.

Then Hinton heard Sanchez's voice: "It was my girl." *Id.* A shot rang out. *Id.* Hinton went into the living room and found Gooch lifeless on the floor. *Id.*

Before long, the Joliet Police Department put several officers on the case, including Detective Patrick Schumacher. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶¶ 4, 7 (Dckt. No. 87). On the afternoon of the murder, Detective Schumacher and five other officers went to the home of Plaintiff Jesus Zambrano to investigate. *Id.* at ¶ 8.

This Court does not know what initially brought Zambrano into the sights of the police. Maybe the detective was looking for Sanchez, and heard that he was at Zambrano's home. Or maybe there is some other explanation. Whatever the reason, the important thing is that the police went to Zambrano's residence.

Zambrano was home, with his mom. *Id.* at ¶ 9. Pedro Sanchez and another man, Michael Ortiz, were there too. *Id.*

Detective Schumacher and Zambrano talked. *Id.* at ¶ 10; *see also* Zambrano Dep., at 104:17-21 (Dckt. No. 79-1). Their conversation is the crux of this case.

According to Detective Schumacher, Zambrano gave some details about where he was, and who he was with, on the afternoon before the murder. The parties don't explain the significance of this piece of the evidentiary puzzle. The idea seems to be that Zambrano allegedly admitted to the officer that he was with Pedro Sanchez and Michael Ortiz on the afternoon before the murder. And he admitted that they were at a specific location.

As the detective later retold it, Zambrano said that "in the afternoon hours of May 21, 2009, he was with his friends, Pedro Sanchez and Michael Ortiz at Claudia Sanchez's residence located near the area of Ruby St. and the westside of the Des Plaines River." *See* Pl.'s Resp. to

Defs.' Statement of Facts, at ¶ 10 (Dckt. No. 87); *see also* Schumacher Dec., at ¶ 9 (Dckt. No. 79-3).

Zambrano admits that he was, in fact, at Claudia Sanchez's house with Pedro Sanchez and Michael Ortiz on May 21, meaning the day before the murder. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 38 (Dckt. No. 87). Zambrano admits that he was "drinking beer and smoking marijuana while at Claudia's residence." *Id.* at ¶ 39.

But according to Zambrano, he did not give those details to Detective Schumacher. That is, he didn't name names, and he didn't tell Detective Schumacher how to find Claudia Sanchez's house on a map. *Id.* at ¶ 23.

Instead, Zambrano says that he kept things vague during that 2009 interview. He simply told Detective Schumacher that he hung out "with [his] girl and a couple friends[.]" *See* Zambrano Dep., at 113:8-9 (Dckt. No. 79-1). (As an aside, at the time, Zambrano and Ms. Sanchez were dating. *Id.* at 113:14-18.)

So, by the sound of things, Zambrano *was* with Pedro Sanchez and Michael Ortiz at Claudia Sanchez's residence on the afternoon of May 21, meaning the afternoon before the murder. Everyone agrees that Zambrano was there. But the parties disagree about whether Zambrano shared those details with Detective Schumacher during the interview.

Zambrano apparently went to the police station for a follow-up interview with the officers later that day. But the contents of that interview are not material to the case at hand. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶¶ 12–14 (Dckt. No. 87).

Later that day (still May 22), Detective Schumacher interviewed Ms. Sanchez at her apartment. *Id.* at ¶ 15. Ms. Sanchez confirmed that Zambrano spent time at her apartment the

day before (May 21), along with Pedro Sanchez, Michael Ortiz, and someone else – Christian Lopez. *Id.* Ms. Sanchez's roommate gave the same account. *Id.* at ¶ 16.

Ms. Sanchez and her roommate also both positively identified Zambrano, Pedro Sanchez, Michael Ortiz, and Christian Lopez as the men who were at their residence when Detective Schumacher presented photo lineups. *Id.* at ¶¶ 15–16.

### *The Lopez Interview*

Detective Schumacher's long day on the job didn't end there. Christian Lopez voluntarily showed up at the police station. *See Zambrano*, 64 N.E.3d at 642.

Detective Schumacher interviewed Lopez at 10 p.m. that night (May 22). *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 17 (Dckt. No. 87). Lopez "confirmed" Zambrano's "involvement in the murder of Robert Gooch." *Id.*

Lopez told Detective Schumacher (and eventually the jury) the following story.

According to Lopez, he hung out with Zambrano, Sanchez, and Ortiz at Ms. Sanchez's home. *Id.* Lopez "confirmed that he was with Plaintiff, Pedro Sanchez and Michael Ortiz at Claudia's house where they were drinking and smoking marijuana." *Id.*

Lopez shared that Zambrano drove the group (meaning Lopez, Pedro Sanchez, and Ortiz) to McDonald's. *Id.* at ¶ 18. And then the group drove to the Larkin Apartments. *Id.*

Once the group reached the apartment complex, Lopez saw Zambrano get a gun from the car's hood. *Id.* at ¶ 19. Lopez, Sanchez, and Zambrano went into the building. *Id.* Lopez stood at the bottom of the stairwell. *Id.* But Sanchez and Zambrano climbed up three floors. *Id.*

Lopez heard a gunshot. *Id.* Then he saw Zambrano and Sanchez run down the stairs to the car. *Id.*

Back outside, Lopez saw Zambrano put the gun back under the car's hood. *Id.* at ¶ 20. Zambrano drove everyone back to his house, where they spent the night. *Id.*; *see also Zambrano*, 64 N.E.3d at 642.

Lopez couldn't sleep. *See Zambrano*, 64 N.E.3d at 642. When the sun rose, he walked home. *Id.* Sometime later, he went to the police station. *Id.*

### The Police Report

Detective Schumacher's long day of investigating bled into the early morning hours of May 23, 2009. He prepared a police report at 2:35 a.m. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 22 (Dckt. No. 87); *see also* Schumacher Declaration, at ¶ 24 (Dckt. No. 79-3, at 3 of 11); Schumacher Report (Dckt. No. 79-3, at 6 of 11).

According to the police report, Zambrano admitted that he was with Pedro Sanchez and Michael Ortiz the day before the murder, and admitted the specific location:

> On 5/22/09 at approximately 1500 hrs I had the following conversation with Jesus Zambrano in essence and not verbatim. . . . Zambrano asked me why we wanted to speak with him and I advised him that his name had come up in an investigation and I asked him where he was last night. Zambrano stated to me that he was with his friends, PEDRO and MICHAEL. (It should be noted Pedro Sanchez and Michael Ortiz were present at the Zambrano's residence when we made contact with Zambrano and his mother). Zambrano stated to me that he, Pedro, and Michael had gone to a girl's house by the name of CLAUDIA who had lived somewhere in the area of Ruby St. near the Westside of the Desplaines River.

*See* Schumacher Report (Dckt. No. 79-3, at 6–7 of 11).

### The Arrest

Three days later, the Joliet Police Department obtained a warrant for Zambrano's arrest. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 21 (Dckt. No. 87). The Department relied on

the information that Lopez had revealed.  *Id.*  Detective Schumacher was not involved in obtaining Zambrano's arrest warrant.  *Id.* at ¶ 28.

On May 26, officers went to Zambrano's home to arrest him.  *Id.* at ¶ 31.  He wasn't home, but his mom was there.  *Id.*  Zambrano's mom told the officers that Zambrano "would turn himself in."  *Id.*

Zambrano never showed up at the police station.

Instead, officers received word that Zambrano, his mom, and his grandma had fled the residence in a red vehicle.  *Id.* at ¶ 32.  The Department entered the vehicle's information into a database, alerting officers across the United States to keep an eye out for the car.  *Id.*

Zambrano and his matriarchs turned up a long way from Illinois.

On May 28, a Texas state trooper spotted the vehicle.  *Id.* at ¶ 33.  The trooper pulled it over.  *Id.*  The male occupant told the trooper that he did not have identification, and that his name was "Juan."  *Id.* at ¶ 34.

As it turns out, Zambrano's fingerprint gave him away.  The trooper ran the man's fingerprints, and the trooper figured out that Juan was really Jesus Zambrano.  *Id.* at ¶ 35.  So, the trooper arrested Zambrano.  *Id.*

### The First Trial

The state charged Zambrano with first-degree murder.  *Id.* at ¶ 44.

During a pre-trial hearing, Zambrano's counsel seemed to acknowledge Zambrano's conversation with Detective Schumacher.  Counsel told the state court that Zambrano had made a brief statement "where he indicated that he was with his friends, Pedro and Michael. Zambrano then stated that they had gone to a girls house name[d] Claudia who lived somewhere around Ruby Street on the west side of the Des Plaines River."  *Id.* at ¶ 42 (cleaned up).

At trial, the state called seventeen witnesses to the stand.  *Id.* at ¶ 45.  Detective Schumacher testified.  *Id.*  So did Lopez, the state's star witness.  *Id.*

Among other things, Detective Schumacher testified about the underlying facts in his police report.  *Id.* at ¶ 50.  He told the jury about his conversation with Zambrano on May 22.  *Id.*

Specifically, Detective Schumacher testified that Zambrano had given him details about where he was, and who he was with.  The testimony tracked the arrest report:

> Q:     And did you ask him any questions?
>
> A:     Yes, I asked him where he was the night prior.
>
> Q:     So, that would have been the evening of May 21, 2009?
>
> A:     Yes.
>
> Q:     Did he answer that question?
>
> A:     Yes.
>
> Q:     What did he tell you?
>
> A:     He stated that he was with Miguel Ortiz and Pedro Sanchez and that they had left from his residence and went to a female's residence who he names . . . who he knew as Claudia, who lived off Ruby Street near the west side of the Des Plaines River.

*Id.*  The prosecutor "had no reason to believe that Detective Schumacher's police report" or "testimony was false."  *Id.* at ¶ 51.

So Detective Schumacher testified about the substance of his interview with Zambrano on May 22.  But the prosecution did *not* admit the police report into evidence.  *Id.* at ¶ 52.

The jury considered more than just testimony.  *Id.* at ¶ 47.  The jury saw surveillance videos from McDonald's and the Larkin Apartments.  *Id.*

The McDonald's video showed Zambrano pull through the drive thru between 12:36 a.m. and 12:40 a.m. on May 22. *See Zambrano*, 64 N.E.3d at 639.[2]  In the case at hand (before this Court), Zambrano admits that he drove to McDonald's, and admits that he is the driver in the video. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 41 (Dckt. No. 87).

An apartment complex surveillance video shows Zambrano's sedan pulling up not much later, at 12:47 a.m. *See Zambrano*, 64 N.E.3d at 641.  An officer testified that the apartment complex was a 5-to-10-minute drive from the McDonald's. *Id.*

The video seems to have mirrored the story that Lopez told the jury. *Id.* at 641–42.  The driver pulled up, got something from under the car's hood, and walked toward the building, alongside two of the passengers. *Id.* at 641.

The men returned to the car at 12:51 a.m. *Id.*  The driver ran across the grass, put something back under the car's hood, and pulled away. *Id.*

During deliberations, the jury wanted to see some of the evidence in the jury room. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 63 (Dckt. No. 87).  It asked for the surveillance videos and photographs. *Id.*

Then the jury announced its verdict:  guilty. *Id.* at ¶ 66.  Zambrano appealed. *Id.*

**The Appeal**

On appeal, Zambrano made two arguments. *Id.*  He challenged his conviction on the ground that counsel failed to impeach Lopez with evidence that he received immunity to testify, and that the state court did not instruct the jury about accomplice liability. *Id.*

---

[2]  Again, the appellate court decision isn't evidence.  And the point isn't material, either.  But it is interesting, and it does enliven the story.  The Court relies on it simply for purposes of retelling the narrative.

The Appellate Court of Illinois sided with Zambrano. *Id.* at ¶ 68. It reversed the judgment and remanded, based on the missing jury instruction. *Id.* According to the appellate court, the missing instruction deprived the jury of "critical information it needed to evaluate Lopez's testimony." *Id.*; *see also Zambrano*, 64 N.E.3d at 647.

### The Second Trial

The state tried again. And Zambrano got tried again.

Zambrano's second trial was déjà vu in many respects. For example, the state admitted the surveillance videos into evidence. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 75 (Dckt. No. 87). Lopez testified again. *Id.* at ¶ 71. Detective Schumacher did, too. *Id.*

Like the first time around, Detective Schumacher testified that Zambrano told him that on the night of the murder, he "was with several friends" – "Pedro Sanchez and Miguel Ortiz" – and that they had "gone to a girl's house named Claudia near the area off of Ruby Street, just west of the Des Plaines River." *Id.* at ¶ 72.

The second jury also asked to see some evidence during deliberations. *Id.* at ¶ 77. Among other things, it wanted to see the apartment surveillance videos and Lopez's trial transcript. *Id.*

Then the jury announced its verdict: not guilty. *Id.* at ¶ 70.

### The Federal Lawsuit

With the first-degree murder charge behind him, Zambrano filed a lawsuit of his own. *See* Cplt. (Dckt. No. 3). The complaint contains two counts.

The first count is a due process claim under the Fourteenth Amendment against Detective Schumacher. *Id.* at ¶¶ 1, 119–22. The complaint alleges a "fabrication of a false statement allegedly made by" Zambrano. *Id.* at 11.

Specifically, Zambrano alleged that Detective Schumacher "authored a false police report, in which Schumacher claimed that . . . Zambrano admitted he was in the company of acting in concert with Michael Ortiz and Pedro Sanchez, the actual killer." *Id.* at ¶ 120. According to the complaint, Schumacher "conveyed this information to the prosecutors and testified to these false statements at trial." *Id.* at ¶ 121.

The second count is an indemnification claim against the City of Joliet. *Id.* at ¶¶ 123–25.

Defendants moved to dismiss the complaint for failure to state a claim. *See* Defs.' Mtn. to Dismiss (Dckt. No. 9). This Court granted the motion in part and denied it in part. *See* 8/11/22 Order (Dckt. No. 38).

This Court granted the motion to the extent that Zambrano's claim relied on testimony that Detective Schumacher gave at trial. Police officers testifying in criminal proceedings enjoy absolute immunity from section 1983 suits based on that testimony. *Id.* (citing *Briscoe v. LaHue*, 460 U.S. 325, 335–36, 345 (1983)).

This Court otherwise denied Defendants' motion to dismiss. *Id.* The Court explained that Zambrano's complaint seemed to take issue with more than Detective Schumacher's trial testimony. *Id.*

After discovery, Defendants moved for summary judgment. *See* Defs.' Mtn. for Summary Judgment (Dckt. No. 77). The Court turns to the motion.

### Legal Standard

A party is entitled to summary judgment if it shows that there is no genuine dispute as to any material fact and it is entitled to judgment as a matter of law. *See Jaranowski v. Indiana Harbor Belt Railroad Company*, 72 F.4th 744, 749 (7th Cir. 2023) (citation omitted). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a

verdict for the nonmoving party." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party moving for summary judgment has the burden to show that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To survive, the opposing party must identify specific facts showing a genuine issue for trial. *See Anderson*, 477 U.S. at 256.

To decide the motion, this Court views the evidence and draws all reasonable inferences in Zambrano's favor as the non-moving party. *See Jaranowski*, 72 F.4th at 749. This Court does not weigh the evidence, or judge witness credibility, or determine the truth of the matter. *See Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008). Instead, the Court determines whether a genuine issue of triable fact exists. *Id.*

In sum, summary judgment is only appropriate if – considering the evidence – no reasonable jury could return a verdict in Zambrano's favor. *See Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012).

**Analysis**

The Fourteenth Amendment forbids states from depriving any person of liberty "without due process of law." *See* U.S. CONST. amend. XIV. Under recent case law, that guarantee of liberty includes protection from fabricated evidence. "Maybe there was a time when fabricated evidence did not give rise to a due process claim, but that's not the current state of the law." *See Hill v. Cook County*, 463 F. Supp. 3d 820, 835 (N.D. Ill. 2020).

"The essence of a due-process evidence-fabrication claim is that the accused was convicted and imprisoned based on knowingly falsified evidence, violating his right to a fair trial

and thus depriving him of liberty without due process." *See Patrick v. City of Chicago*, 974 F.3d 824, 835 (7th Cir. 2020).

"An evidence-fabrication claim has four elements: (1) the defendant knowingly fabricated evidence against the plaintiff, (2) the evidence was used at his criminal trial, (3) the evidence was material, and (4) the plaintiff was damaged as a result." *See Brown v. City of Chicago*, 633 F. Supp. 3d 1122, 1156 (N.D. Ill. 2022) (citing *Patrick*, 974 F.3d at 835).

Defendants argue that they are entitled to summary judgment for three reasons. First, Defendants argue that there is no evidence that Detective Schumacher deliberately falsified his report. Second, the report was not used against Zambrano at trial. Finally, Defendants argue that the report did not impact the first jury's guilty verdict. *See* Defs.' Mem., at 3–4 (Dckt. No. 78).

The Court will address the first two arguments (only). After the belt and the suspenders, there is no need to reach the third argument.

## I. Intent to Falsify

Out of the gate, Defendants argue that there is no evidence about the intent of Detective Schumacher. The Court agrees. On this record, no reasonable jury could find that Detective Schumacher deliberately falsified his report.

A fabricated-evidence claim requires more than incorrect or inaccurate evidence. *See Patrick v. City of Chicago*, 974 F.3d 824, 835 (7th Cir. 2020). The claim requires a showing of "knowingly falsified evidence." *Id.*

Proving that the police made a mistake is not enough – not by a long shot. Deliberately falsifying information means more than making a mistake. It is not an accident, an oversight, a blunder, a goof, or a gaffe. "Deliberately" falsifying information means serving up a lie, on purpose.

15

Indeed, the Seventh Circuit has described the intent standard as a "high bar to clear." *See Coleman v. City of Peoria*, 925 F.3d 336, 344 (7th Cir. 2019) (citation omitted); *see also Avery v. City of Milwaukee*, 847 F.3d 433, 439 (7th Cir. 2017) (explaining that "[w]hat's relevant" is "whether the officers created evidence that *they knew to be false*") (cleaned up) (emphasis in original); *see also Black v. Montgomery County*, 835 F.3d 358, 372 (3d Cir. 2016) ("There must be pervasive evidence supporting a conclusion that the proponents of the evidence are aware that evidence is incorrect or that the evidence is offered in bad faith.") (cleaned up).

Of course, intent is "most often proven circumstantially." *See Stinson v. Gauger*, 868 F.3d 516, 527 (7th Cir. 2017). An admission isn't necessary, and neither is a smoking gun. A defendant will rarely raise his hand and say, "I intended to do something wrong."

Still, a plaintiff cannot avoid summary judgment simply because intent is an element of the claim. "Summary judgment will not be defeated simply because issues of motive or intent are involved, and is proper when the plaintiff fails to indicate any motive or intent to support plaintiff's position." *See Morgan v. Harris Tr. & Sav. Bank of Chi.*, 867 F.2d 1023, 1026 (7th Cir. 1989); *see also Paulsen v. Olsen*, 2023 WL 8019393, at *9 (N.D. Ill. 2023). Issues about intent have no special fast-pass to a jury trial.

Against that backdrop, Zambrano has almost nothing to show when it comes to the officer's intent. In fact, Zambrano's entire argument about Detective Schumacher's intent boils down to one paragraph in his brief. *See* Pl.'s Resp., at 7 (Dckt. No. 86).

According to Zambrano, a jury could find that Detective Schumacher deliberately falsified the evidence because "Schumacher says that Zambrano told Schumacher his whereabouts; Jesus Zambrano says he did not. This is a classic example of a 'He Said/She Said' conflict which cannot be resolved on summary judgment." *Id.*

Zambrano misses the point. The accuracy of the report is important, but it is not the whole ballgame. Proving that the police report contained inaccurate information is necessary, but not sufficient. A mistake is different than a lie, and when it comes to a fabricated-evidence claim, the difference is everything.

The issue is *not* whether a reasonable jury could find that the police report contained inaccurate information. The issue is whether a reasonable jury could find that the officer prepared an inaccurate report deliberately.

Framing the issue as "He Said/She Said" overlooks the need for evidence about intent. The question is the intent of the officer, not the accuracy of the officer's report. *See Boseman v. Upper Providence Twp.*, 680 F. App'x 65, 70 (3d Cir. 2017) ("If we were to hold that the 'he said, she said' dispute here rises to the level of fabricated evidence, we would undermine the 'unusual case' standard dictated by our precedent, which directs concern to cases in which there is actual evidence of fabrication.").

The record at hand includes no evidence that could support a finding by a reasonable jury that the officer deliberately falsified the police report. Without that evidence, Zambrano cannot get to trial on the fabricated-evidence claim.

## II. The Report's Non-Use at Trial

Zambrano's claim suffers from another fatal flaw. The prosecution did not use Detective Schumacher's report as evidence at Zambrano's trial. Zambrano wasn't "convicted and imprisoned based on knowingly falsified evidence," because the police report did not come into evidence. *See Patrick*, 974 F.3d at 835.

The fact that the report did not come into evidence dooms the Fourteenth Amendment claim. The reason stems from the nature of a claim under the Fourteenth Amendment.

17

Taking a step back, evidence-fabrication claims can sprout from the Fourth Amendment *or* the Fourteenth Amendment. *See Patrick*, 974 F.3d at 834–35. It depends on when and how the government uses the phony evidence.

"A claim for false arrest or pretrial detention based on fabricated evidence sounds in the Fourth Amendment right to be free from seizure without probable cause." *Id.* at 834; *see also Young v. City of Chicago*, 987 F.3d 641, 645 (7th Cir. 2021) ("[T]he Fourth Amendment, not the Due Process Clause, governs a claim for wrongful pretrial detention.") (citation omitted). On the other hand, when "fabricated evidence is later *used at trial* to obtain a conviction, the accused may have suffered a violation of his due-process right to a fair trial." *See Patrick*, 974 F.3d at 834 (emphasis added).

Different amendments apply to different stages of an interaction with law enforcement. If the police take you off the street based on phony evidence, that's a potential Fourth Amendment problem. If the state takes you to trial based on phony evidence, that's a potential Fourteenth Amendment problem.

To bring a Fourteenth Amendment claim, a plaintiff has the burden to prove that "the fabricated evidence was used against him *at his criminal trial*." *Id.* at 835 (emphasis added); *see also Jones v. York*, 34 F.4th 550, 562 (7th Cir. 2022) ("A police officer who manufactures false evidence against a criminal defendant violates due process if that evidence is later used to deprive the defendant of her liberty in some way.") (cleaned up); *Avery v. City of Milwaukee*, 847 F.3d 433, 442 (7th Cir. 2017) ("[I]t was the *admission* of the false confession that made [the plaintiff's] trial unfair.") (emphasis added); *Brown*, 633 F. Supp. 3d at 1160 ("[The plaintiff's] evidence-fabrication claim regarding these reports fails because these reports were not used

18

against him at trial. Neither report was introduced at either of [the plaintiff's] trials, and neither report was used to refresh a witness's recollection during either trial.").[3]

After all, remember the constitutional foundation. A Fourteenth Amendment claim is about a denial of due process and a deprivation of "liberty" after a judgment of conviction. *See* U.S. CONST. amend. XIV.

Here, there is no dispute about what happened at the trial. Detective Schumacher's police report was not used at trial – the prosecution did not introduce it into evidence. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 52 (Dckt. No. 87).

So, Zambrano's due process claim fails. *See Mack v. City of Chicago*, 2023 WL 4744791, at *14 (N.D. Ill. 2023) ("[The plaintiff's] fabrication claim as it applies to the police reports fares no better. None of the reports were introduced or used to refresh recollection during [the plaintiff's] criminal trial and therefore none were 'used' at a criminal trial.").

Zambrano argues that the police report was "used" at his criminal trial because there is a "strong likelihood" that the report was "used to convey to the prosecutors the substance of Schumacher's testimony" and that Schumacher reviewed "his testimony with prosecutors before testifying." *See* Pl.'s Resp., at 9 (Dckt. No. 86). Put differently, Zambrano's theory is that the prosecution and Detective Schumacher used the report when they prepared for trial. *Id.*

That argument fails in light of Seventh Circuit precedent about testimonial immunity. In *Jones v. York*, the plaintiff claimed that an officer falsely testified at trial about the officer's police report. *See Jones v. York*, 34 F.4th 550, 563 (7th Cir. 2022). The Seventh Circuit

---

[3] Some courts have concluded that a due process claim can survive when a plaintiff shows that the fabricated evidence was used "to coerce [him] to plead guilty." *See In re Watts Coordinated Pretrial Proceedings*, 2022 WL 9468206, at *7 (N.D. Ill. 2022); *Carter v. City of Chicago*, 2018 WL 1726421, at *5 (N.D. Ill. 2018). That issue is not before this Court.

explained that the officer was "absolutely immune from damages liability for his trial testimony." *Id.*

The immunity was not confined to in-court testimony. The Seventh Circuit confirmed that the officer's immunity covered his "*preparation* of testimony," too. *Id.* (cleaned up) (emphasis added).

Other courts have toed the same line, holding that immunity covers both testimony and the preparation for testimony. *See, e.g.*, *Stinson v. Gauger*, 868 F.3d 516, 528 (7th Cir. 2017) (en banc) (concluding that the defendants did not have testifying-witness absolute immunity because the plaintiff's claims focused on the defendants' "actions while [the] murder was being investigated, not on their testimony at trial *or preparations to testify at trial*") (emphasis added); *Canen v. Chapman*, 847 F.3d 407, 415 (7th Cir. 2017) ("It is long-established that witnesses enjoy absolute immunity, and we have acknowledged that this protection covers the preparation of testimony as well as its actual delivery in court.") (cleaned up); *Newsome v. McCabe*, 319 F.3d 301, 304 (7th Cir. 2003) ("Witnesses enjoy absolute immunity from civil liability on account of their testimony, and that immunity also covers preparation.") (citation omitted).[4]

In sum, Zambrano's claim fails because the police report did not provide the basis for his conviction. At trial, the police report did not see the light of day. The jury never saw the police report, so Zambrano wasn't convicted based on the police report. At best, maybe Detective Schumacher read the report to prepare for testimony, but the preparation for testimony cannot give rise to a claim. Without evidence that the conviction was based on the police report, Zambrano has no claim under the Fourteenth Amendment.

---

[4] True, "police officers who fabricate evidence cannot immunize themselves by authenticating it at trial." *See Jones*, 34 F.4th at 563. "In other words, police officers cannot purify fabricated evidence by invoking [the] absolute-immunity rule." *Id.* But here, Detective Schumacher did not "authenticate" the report at trial, because the report was not *introduced* at trial.

**Conclusion**

For the foregoing reasons, Defendants' motion for summary judgment is granted.

Date:   February 9, 2024

_____
Steven C. Seeger
United States District Judge

## STATEMENT UNDER CIRCUIT RULE 30(D)

I, Stephen L. Richards, attorney of record for plaintiff-appellant  certifies that this Required Short Appendix complies with the requirements of Circuit Rule 30(a) and (b) and that all required documents have been included.

/s/ Stephen L. Richards

_____

Stephen L. Richards

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................. A-1

JUDGMENT ORDER …………………………………………………………………..A-2

MEMORANDUM OPINION AND ORDER………………………………………..A-3

STATEMENT UNDER CIRCUIT COURT RULE 30(D)…………………………. A-11

CERTIFICATE OF SERVICE

The undersigned, Stephen L. Richards hereby certifies that the document entitled

"BRIEF AND REQUIRED SHORT APPENDIX OF PLAINTIFFS-

APPELLANTS was submitted on August 6, 2024 pursuant to the Seventh

Circuit's ECF filing system.
By: /s/ Stephen L. Richards

Stephen L. Richards
651 W. Washington, Suite 205
Chicago, IL 60661
773-634-8107
773-817-6927