No. 24-1277

## IN THE UNITED STATES COURT OF APPEALS
### FOR THE SEVENTH CIRCUIT

Jesus Zambrano,
Plaintiff – Appellant,

v.

City of Joliet, et al.,
Defendants – Appellees.

Appeal from the United States District Court
For the Northern District of Illinois, Eastern Division,
Case No. 21-cv-4496
The Honorable Judge Steven C. Seeger

## BRIEF OF THE DEFENDANTS-APPELLEES, CITY OF JOLIET AND PATRICK SCHUMACHER

John O'Driscoll
Darcy Proctor
Andrew O'Donnell
Tressler LLP
233 South Wacker Drive 61st Floor
Chicago, Illinois 606061
(312) 627-4000

# DISCLOSURE STATEMENT

Appellate Court Number: 24-1277
Short Caption: Zambrano v. City of Joliet, *et al.*

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information:

(1)     The full name of every party that the attorney represents in the case:

   The City of Joliet and Patrick Schumacher.

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

   Tressler LLP

(3)     If the party or amicus is a corporation

   (i)     Identify all its parent corporations, if any; and

   (ii)     List any publicly held company that owns 10% or more of the party's or amicus' stock.

   N/A

---

Attorney Signature:          /s/ *Darcy Proctor*   Date: September 9, 2024
Attorney's Printed Name:          Darcy Proctor

Are you *Counsel of Record* for the above listed parties pursuant to Cir. Rule 3(d)?
Yes.

Address:     233 S. Wacker Drive, 61st Floor
                   Chicago, IL 60606
Telephone:   (312) 627-4010                    Facsimile:   (312) 627-1717
E-Mail Address: dproctor@tresslerllp.com

<u>**DISCLOSURE STATEMENT**</u>

Appellate Court Number:  24-1277
Short Caption: Zambrano v. City of Joliet, *et al.*

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information:

(1)     The full name of every party that the attorney represents in the case:

   The City of Joliet and Patrick Schumacher.

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

          Tressler LLP

(3)     If the party or amicus is a corporation

   (i)     Identify all its parent corporations, if any; and

   (ii)     List any publicly held company that owns 10% or more of the party's or amicus' stock.

          N/A

---

Attorney Signature:          <u>/s/ *John O'Driscoll*</u>  Date: September 9, 2024
Attorney's Printed Name:          John O'Driscoll

Are you *Counsel of Record* for the above listed parties pursuant to Cir. Rule 3(d)? Yes.

Address:     233 S. Wacker Drive, 61st Floor     550 E. Boughton Road, Suite 250
             Chicago, IL 60606                   Bolingbrook, Illinois 60440
Telephone: (312) 627-4010                        Facsimile: (312) 627-1717

E-Mail Address: jodriscoll@tresslerllp.com

# DISCLOSURE STATEMENT

Appellate Court Number: 24-1277
Short Caption: Zambrano v. City of Joliet, *et al*.

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party or amicus curiae, or a private attorney representing a government party, must furnish a disclosure statement providing the following information:

(1)     The full name of every party that the attorney represents in the case:

      The City of Joliet and Patrick Schumacher.

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

          Tressler LLP

(3)     If the party or amicus is a corporation

     (i)     Identify all its parent corporations, if any; and

     (ii)     List any publicly held company that owns 10% or more of the party's or amicus' stock.

      N/A

---

Attorney Signature:          */s/ Andrew O'Donnell*  Date: September 9, 2024
Attorney's Printed Name:          Andrew O'Donnell

Are you *Counsel of Record* for the above listed parties pursuant to Cir. Rule 3(d)? Yes.

Address:     233 S. Wacker Drive, 61st Floor     550 E. Boughton Road, Suite 250
              Chicago, IL 60606     Bolingbrook, Illinois 60440
Telephone:     (312) 627-4010     Facsimile: (312) 627-1717

E-Mail Address: dodonnell@tresslerllp.com

# TABLE OF CONTENTS

DISCLOSURE STATEMENT ..................................................................... ii-iv

JURISDICTIONAL STATEMENT ............................................................. 1

STATEMENT OF ISSUES ......................................................................... 1

STATEMENT OF THE CASE ..................................................................... 1

    Introduction ............................................................................................ 1

    The Murder Investigation ..................................................................... 2

    Plaintiff's First Criminal Trial ............................................................ 7

    Criminal Appeal ................................................................................... 10

    Second Criminal Trial ......................................................................... 10

    Summary Judgment ............................................................................. 11

SUMMARY OF THE ARGUMENT .......................................................... 11

STANDARD OF REVIEW ....................................................................... 13

ARGUMENT ............................................................................................. 13

I.    Summary Judgment Was Proper ..................................................... 13

    A.    The Trial Court Properly Granted Summary Judgment On
            Plaintiff's Fabrication Of Evidence Claim. ............................ 13

    i.    Defendant Schumacher Did Not Deliberately Create His Police
        Report In Bad Faith Because All the Underlying Factual
        Information In His Police Report Is True. ............................ 14

    ii.    Plaintiff's Fabrication Of Evidence Claim Fails Because Defendant
        Schumacher's Police Report Was Not Used Against Him at Trial ...... 17

    iii.    Defendant Schumacher's Police Report Did Not Have A Material
        Impact On Plaintiff's Guilty Verdict. ................................... 23

    B.    Given That There Is No Underlying Constitutional Violation,
            Plaintiff's Indemnification Claim Against the City of Joliet Fails....... 31

CONCLUSION ......................................................................................... 32

# TABLE OF AUTHORITIES

## Cases

*Avery v. City of Milwaukee,*
   847 F.3d 433 (7th Cir. 2017) ..................................................... 19, 20

*Brown v. City of Chicago,*
   2022 WL 4602714 (N.D. Ill. 2022) .......................................... 13, 14, 18, 19

*Coleman v. City of Peoria, Illinois,*
   925 F.3d 336 (7th Cir. 2019) ..................................................... 14

*Coleman v. Hardy,*
   690 F.3d 811 (7th Cir. 2012) ..................................................... 31

*Fabiano v. City of Palos Hills,*
   336 Ill. App. 3d 635, 784 N.E.2d 258, (2002) ........................... 23

*Jones v. York,*
   34 F.4th 550 (7th Cir. 2022) ................................................... 17, 19, 22

*Holland v. City of Chicago,*
   643 F.3d 248 (7th Cir. 2011) ................................................... 23, 24

*Liu v. T & H Machine, Inc,*
   191 F.3d 790 (7th Cir.1999) ................................................... 21

*Mack v. City of Chicago,*
   2023 WL 4744791 (N.D. Ill. 2023) .......................................... 19

*Massey v. Ojaniit,*
   759 F.3d 343 (4th Cir. 2014) ................................................... 21

*Patrick v. City of Chicago,*
   974 F.3d 824 (7th Cir. 2020). ................................................ 14, 18, 23

*Petty v. City of Chicago,*
   754 F.3d 416 (7th Cir. 2014) ................................................. 14

*REXA, Inc. v. Chester,*
   42 F.4th 652, 662 (7th Cir. 2022) .......................................... 22

*Tayborn v. Scott,*
   251 F.3d 1125 (7th Cir. 2001) ............................................... 31

*Turubchuk v. S. Illinois Asphalt Co., Inc.,*
   958 F.3d 541 (7th Cir. 2020) ................................................. 13

*U.S. ex rel. Coleman v. Shaw,*
   2009 WL 1904370 (N.D. Ill. 2019) ......................................... 31

## JURISDICTIONAL STATEMENT

Appellant Jesus Zambrano's ("Plaintiff") jurisdictional statement is complete and correct.

## STATEMENT OF ISSUES

1. Whether summary judgment was properly granted to Defendant Patrick Schumacher ("Defendant Schumacher") regarding Plaintiff's fabrication of evidence claim (Count I).

2. Whether summary judgment was properly granted to Defendant City of Joliet regarding Plaintiff's indemnification claim (Count II).

## STATEMENT OF THE CASE

### Introduction

This case arises from a criminal prosecution for the murder of Robert Gooch where Plaintiff was found guilty. ECF #79, ¶ 44. Following Plaintiff's conviction, he appealed arguing ineffective assistance of counsel in that: (1) his counsel failed to impeach Christian Lopez with evidence that he received immunity to testify; and (2) failed to tender a jury instruction for accomplice liability. ECF #79, ¶ 66. The Appellate Court reversed the conviction and remanded the case solely on the basis that his counsel's "failure to submit an instruction on accomplice testimony prejudiced Zambrano by depriving the jury of critical information it needed to evaluate Lopez's testimony." ECF #79, ¶ 68. At Plaintiff's second criminal trial, he was found not guilty. ECF #79, ¶ 70.

Now, Plaintiff brings this lawsuit arguing that Detective Patrick Schumacher created a false police report and gave false testimony at trial regarding a conversation

that the two of them had on May 22, 2009. Specifically, Defendant Schumacher's report states that on May 22, 2009, he had the following conversation with the Plaintiff:

> Zambrano stated to me that he was with his friends, PEDRO and MICHAEL. (It should be noted Pedro Sanchez and Michael Ortiz were present at the Zambrano's residence when we made contact with Zambrano and his mother). Zambrano stated to me that he, Pedro, and Michael had gone to a girl's house by the name of CLAUDIA who lived somewhere in the area of Ruby St. near the Westside of the Desplaines River.

ECF #79, ¶ 36.

Interestingly, Plaintiff does not dispute the underlying factual information in Defendant Schumacher's police report, *i.e.*, that on May 21, 2009, he was with Michael Ortiz and Pedro Sanchez at Claudia Sanchez's house hours prior to the murder. ECF #87, ¶ 38. The only thing Plaintiff disputes is that he never told Defendant Schumacher the names of his friends (Pedro and Michael), and that he did not tell Schumacher the exact location of his whereabouts. Instead, according to Plaintiff, Defendant Schumacher must have obtained that information from someone else.

## The Murder Investigation

On May 22, 2009, at around 1:00 a.m., the Joliet Police Department were notified that Robert Gooch was murdered at his girlfriend, Elissa Hinton's apartment located at Larkin Apartments, 1007 Louis Place, Apartment #309, Joliet, IL 60435. ECF #79, ¶ 5. The Joliet Police Department began an investigation, led by Detective Shawn Filipiak, where they quickly discovered their two prime suspects – Jesus Zambrano and Pedro Sanchez. ECF #79, ¶ 6.

At approximately 3:00 p.m. on May 22, 2009, Defendant Schumacher and other officers, went to Plaintiff's residence. Plaintiff and his friends. Pedro Sanchez and Michael Ortiz were there. ECF #79, ¶¶ 8-9. Defendant Schumacher had a conversation with the Plaintiff, and he communicated to Schumacher that in the afternoon hours of May 21, 2009, he was with his friends, Pedro and Michael, at Claudia's residence. ECF #79, ¶ 10. Plaintiff testified that he told Defendant Schumacher "I told him I was with my girl and a couple friends the night before, and that was it." Ex. A, 113: 8-9." Defendant Schumacher did not ask Plaintiff the material question of where he was at the time of the murder, but asked Plaintiff if he would speak with him at the police station, which Plaintiff agreed. ECF #79, ¶ 11. While at the Joliet Police Department, Defendant Schumacher read Plaintiff his rights and Plaintiff then refused to speak. ECF #79, ¶ 13. Plaintiff was then released without any charges. ECF #79, ¶ 14.

The investigation continued, and Defendant Schumacher obtained additional evidence corroborating that Plaintiff was in fact with Pedro Sanchez and Michael Ortiz at Claudia Sanchez's residence hours before the murder. Defendant Schumacher went to Claudia Sanchez's residence, and she confirmed that Plaintiff was at her apartment on May 21, 2009 with Pedro Sanchez, Michael Ortiz, and Christian Lopez. ECF #79, ¶ 15. Claudia Sanchez was presented with four different photo lineups and positively identified Plaintiff, Pedro Sanchez, Michael Ortiz, and Christian Lopez as the individuals who were at her residence on May 21, 2009. ECF #79, ¶ 15. Additionally, Defendant Schumacher spoke with Latoya Ortiz who also

resided at the apartment with Claudia Sanchez who once again confirmed that Plaintiff was at her apartment on May 21, 2009 with Pedro Sanchez, Michael Ortiz, and Christian Lopez. ECF #79, ¶ 16.

Following the conversations with Claudia and Latoya, the police obtained critical evidence regarding Plaintiff's involvement in the murder of Robert Gooch. Specifically, on May 22 at 10:10 p.m., Defendant Schumacher and Detective Schott spoke with Christian Lopez who confirmed that Plaintiff was with Pedro and Michael at Claudia's residence. ECF #79, ¶ 17. Lopez stated that Plaintiff then drove them to McDonald's and after that, went to Larkin Apartments. ECF #79, ¶ 18. Lopez stated that he saw Plaintiff take what appeared to be a gun out of the hood of the car and go into the apartments to the third floor where the murder took place. ECF #79, ¶ 19. Lopez stated that the next thing he heard was a gunshot and saw Plaintiff run back to the car and place the gun back into the hood of the car. ECF #79, ¶¶ 19-20. Lopez then stated that Zambrano then drove them – Plaintiff, Pedro Ortiz, Michael Sanchez, and him – to Zambrano's residence, wherein they all spent the night. ECF #79, ¶ 20.

Following this conversation, on May 23, 2009 at approximately 2:35 a.m., Defendant Schumacher drafted the police report that stated:

> I had the following conversation with Jesus Zambrano **in essence and not verbatim**.
>
> I advised Zambrano that he was not in custody and he was free to leave at any point. I asked him if he would have a seat in the back of Sgt. Reid's unmarked squad car and he agreed to speak with me. At about that time, I reiterated to him again that he was not under arrest. Zambrano asked me why we wanted to speak with him and I advised

him that his name had come up in an investigation and I asked him where he was last night. Zambrano stated to me that he was with his friends, PEDRO and MICHAEL. (it should be noted Pedro Sanchez and Michael Ortiz were present at the Zambrano's residence when we made contact with Zambrano and his mother.) Zambrano stated to me that he, Pedro, and Michael had gone to a girl's house by the name of CLAUDIA who lived somewhere in the area of Ruby St. near the Westside of the Desplaines River. Zambrano stated that he had several icehouse beers and had smoked some marijuana while at Claudia's house however he was not intoxicated. He stated that he and his friends had gone to Claudia's house and that they then returned to his house at 1025 N. Raynor.

ECF #79, ¶ 37 and ECF #79-2.

Plaintiff admits that he spoke with Detective Schumacher on May 22, 2009, at approximately 3:00 p.m. outside his residence. ECF #79, ¶ 37. Plaintiff admits that on May 21, 2009, he was with his friends Michael Ortiz and Pedro Sanchez at Claudia Sanchez's residence located near the area of Ruby St. and the westside of the Des Plaines River. ECF #79, ¶ 38. Plaintiff admits that he told Defendant Schumacher "I told him I was with my girl and a couple friends the night before, and that was it." ECF #79-1, 113: 8-9. Plaintiff admits that when he left Claudia Sanchez's residence, he drove Pedro Sanchez, Michael Ortiz and Christian Lopez to the McDonald's in Joliet, Illinois and that he is the driver depicted in the McDonald's video. ECF #79, ¶¶ 40-41. Even before the eve of trial, Plaintiff's counsel - Cosmo Tedone – admitted during a court proceeding that Plaintiff made a brief statement to Defendant Schumacher that "he was with his friends, Pedro, and Michael. Zambrano then stated that they had gone to a girl's house named Claudia who lived somewhere around Ruby Street on the west side of the Des Plaines River." ECF #79, ¶ 42.

Following Defendant Schumacher's police report, the Joliet Police Department

obtained video surveillance from the McDonald's and Larkin Apartments which corroborated Lopez's version of events. First, the McDonald's video showed Plaintiff driving through the McDonald's with passengers. ECF #79, ¶ 54. Second, the Larkin Apartments video showed that the same vehicle that went through McDonald's, arrived at the Larkin Apartments ten minutes later. ECF #79, ¶ 55. The Larkin Apartments video also depicted what appeared to be Plaintiff grabbing an item out of the hood of the vehicle and walking towards the place of the murder. ECF #79, ¶ 56. The Larkin Apartments video then showed that same person, *i.e.*, Plaintiff, running back to the car, putting the item back into the hood of the vehicle and driving off. *Id.*

As a result of this thorough investigation, Detective Schott obtained an arrest warrant for the Plaintiff and therefore, went to his residence on May 26, 2009. Plaintiff was not home, but his mom was, and she assured Detective Schott that Plaintiff would turn himself in. ECF #79, ¶ 31. Of course, that did not happen and instead, once Plaintiff got wind of his arrest warrant, he shaved his head and fled to Mexico with his mom and grandma in a red vehicle. ECF #79, ¶¶ 21, 34. The City of Joliet then entered the red vehicle into a data base that allowed all officers within the United States to be on the lookout ("BOLO") for said vehicle. ECF #79, ¶ 32. Texas State Trooper Jon Lantz located this red vehicle 29 miles away from the Mexico border and pulled it over. ECF #79, ¶ 33. Trooper Lantz noticed that Plaintiff shaved his head, and asked for his identification and name. ECF #79, ¶ 34. Plaintiff did not have any identification and lied to the Trooper Lantz, and stated his name was "Juan." ECF #79, ¶¶ 21, 33-34. Plaintiff was arrested and fingerprints later proved

that "Juan" was none other than the Plaintiff, Jesus Zambrano, therein ending his flight to Mexico. ECF #79, ¶ 35.

<u>Plaintiff's First Criminal Trial</u>

Daniel Walsh and Tricia McKenna were assigned to prosecute Plaintiff for first degree murder in the first criminal trial, *People of the State of Illinois vs. Jesus Zambrano*, Case Number 2009-CF-001193. ECF #79, ¶ 43. The criminal trial began on August 12, 2013 and concluded on August 20, 2013 when the jury found Jesus Zambrano guilty of first-degree murder. ECF #79, ¶ 44. The prosecution called seventeen witnesses in its case in chief and Plaintiff's counsel called seven. ECF #79, ¶ 45. The following material exhibits were admitted into evidence:

     a.    People's Exhibit 3 – Surveillance video of Larkin Apartments
     b.    People's Exhibit 4 – Surveillance video of McDonald's
     c.    People's Exhibit 14 – Trooper Lantz's Traffic Stop
     d.    Defense Exhibit 3 - Surveillance video of Larkin Apartments

ECF #79, ¶ 47. Despite Plaintiff's contention throughout his brief, ASA Walsh did not present or direct Defendant Schumacher's testimony, instead it was ASA McKenna (who counsel did not depose). ECF #79, ¶ 48. ASA McKenna chose to call Patrick Schumacher as a witness because of his involvement with performing the GSR test. *Id.* A GSR test detects the presence of distinctive chemicals that are deposited on a person's skin or clothing when a gun is fired. *Id.* During the trial, Defendant Schumacher testified that he attempted to perform a GSR test on Jesus Zambrano and Christian Lopez. ECF #79, ¶ 49. However, instead of using a GSR kit, Schumacher used a fingernail swabbing kit. *Id.* As a result, Schumacher did not obtain a sample from either Zambrano or Lopez because he used the wrong testing

kit. *Id.* During the trial, Defendant Schumacher also testified to the following

interaction with Jesus Zambrano:

> Q. On May 22, 2009, did you have occasion to go to 1025 North Raynor
> in your course of investigating the homicide?
> A: Yes
> Q: And whose residence was that?
> A: The residence of Jesus Zambrano
> Q: When you arrived at the residence of 1025 North Raynor, who was
> present?
> A: Jesus Zambrano, Norma Zambrano, Pedro Sanchez and Michael
> Ortiz
> Q: Did you speak to anybody?
> A: Yes
> Q: Who did you speak to?
> A: Jesus Zambrano
> Q: Did you speak with Jesus Zambrano in front of the other people?
> A: I don't recall if they were present for all the conversation, but at a
> point, I did speak with Mr. Zambrano away from the other people
> Q: And was he in custody when you talked to him?
> A: No
> Q What did you ask him?
> A: I advised that his name has com…excuse me, come up in an
> investigation and that I wished to speak with him.
> Q: And did you ask him any questions?
> A: Yes, I asked him where he was the night prior
> Q: So, that would have been the evening of May 21, 2009?
> A: Yes
> Q: Did he answer that question?
> A: Yes
> Q: What did he tell you?
> A: He stated that he was with Miguel Ortiz and Pedro Sanchez and
> that they had left from his residence and went to a female's residence
> who he names…who he knew as Claudia, who loved off Ruby Street
> near the west side of the Des Plaines River

ECF #79, ¶ 50.

Based on the evidence available to ASA Walsh at the time of trial, he had no

reason to believe that Defendant Schumacher's police report or above testimony was

false. ECF #79, ¶ 51. This evidence included witness statements from Christian

Lopez, Michael Ortiz, Claudia Sanchez, and Latoya Ortiz who all confirmed that Plaintiff was with Michael Ortiz and Pedro Sanchez at Claudia Sanchez's residence on the evening of May 21, 2009. *Id.* Additionally, Claudia Sanchez, and Latoya Ortiz positively identified Plaintiff, Michael Ortiz, and Pedro Sanchez through a photo lineup. *Id.* Schumacher's police report was not admitted into evidence, nor did ASA's McKenna or Walsh use it during Zambrano's criminal trial such as refreshing Schumacher's recollection. ECF #79, ¶ 52.

Schumacher's police report and testimony as to Plaintiff's whereabouts with Michael Ortiz and Pedro Sanchez at Claudia's residence did not have a material impact on the jury's guilty verdict. ECF #79, ¶ 52. Instead, the following material evidence was admitted or solicited through testimony:

- **People's Exhibit 3** – Surveillance video of Larkin Apartments. This video depicted the same vehicle as the McDonald's video arriving at 12:47 a.m. and leaving at 12:54 a.m., which was during the time and location of Gooch's murder. The video also depicted the driver of the gray cutlass, who was wearing the same clothes as Plaintiff in the McDonald's video, open the hood of the gray cutlass and take what appeared to be a gun out of the vehicle and placed it in his waistband. This video further depicts the driver of the gray cutlass entering Larkin Apartments with the alleged handgun where the murder took place. The video further depicts the driver of the gray cutlass running out of Larkin Apartments and leaving the murder scene who placed the alleged handgun back into the hood of said vehicle.

- **People's Exhibit 4** – Surveillance video of McDonald's. This video placed Plaintiff closer in time to the murder than Defendant Schumacher's testimony and clearly depicted Plaintiff as the driver of the vehicle.

- **People's Exhibit 14** – Trooper Lantz's Traffic Stop video and testimony. Trooper Lantz testified that he arrested Plaintiff 29 miles from the Mexico border. Trooper Lantz testified that Plaintiff altered his appearance by shaving his head, did not have any identification on him, and lied to Trooper Lantz when Plaintiff said his name was "Juan."

- **Testimony of Christian Lopez** who was an eyewitness to the murder and testified in support of the prosecution that Plaintiff, along with Pedro Sanchez murdered Robert Gooch.

- **Testimony of Christopher Botzum** - Joliet Police Department's Computer Forensic Examiner Botzum testified using scientific analysis that the gray cutlass in the McDonald's surveillance video was the same gray cutlass in the Larkin Apartment surveillance video.

ASA Walsh, ASA McKenna, and Plaintiff's Counsel Bretz did not rely on Schumacher's testimony during opening or closing arguments. ECF #79, ¶ 61.

<u>Criminal Appeal</u>

Plaintiff appealed his guilty verdict arguing that: (1) his counsel failed to impeach Lopez with evidence that he received immunity to testify; and (2) failed to tender a jury instruction for accomplice liability. ECF #79, ¶ 66. Plaintiff did not argue on appeal that Detective Schumacher gave false testimony and/or created a false police report that was material to the jury's improper guilty verdict. ECF #79, ¶ 67. The Appellate Court of Illinois, Third District reversed and remanded Plaintiff's conviction because of his counsel's "failure to submit an instruction on accomplice testimony prejudiced Zambrano by depriving the jury of critical information it needed to evaluate Lopez's testimony." ECF #79, ¶ 68.

<u>Second Criminal Trial</u>

ASA's John Rickmon and Erin Krone were assigned to prosecute Plaintiff for first degree murder in the second criminal trial, *People of the State of Illinois vs. Jesus Zambrano*, Case Number 2009-CF-001193. ECF #79, ¶ 69. The criminal trial began on August 22, 2019 and concluded on August 27, 2019 when the jury found Plaintiff not guilty of first degree murder. ECF #79,¶ 70. The second criminal trial's

evidence was substantially like the first criminal trial, except that Plaintiff's counsel could now argue accomplice liability. Defendant Schumacher's testimony was similar and like the first trial, his police report was not admitted into evidence. ECF #79, ¶ 72.

<u>Summary Judgment</u>

Plaintiff filed a two count Complaint against Patrick Schumacher and the City of Joliet. Count I alleged a fabrication of evidence claim against Defendant Schumacher and Count II alleged an indemnification claim against the City of Joliet.

The trial court granted Defendants' motion on both Counts. ECF #93. Specifically, the trial court granted Defendant Schumacher's motion on the fabrication of evidence claim because: (1) no reasonable jury could find that Defendant Schumacher deliberately falsified his report; and (2) the alleged false police report was not used against Plaintiff in his criminal trial and therefore, did not deprive the Plaintiff of a denial of due process. *See generally* ECF #93. Due to these rulings, the trial court did not address Defendants' argument that the alleged false police report did not have material impact on Plaintiff's guilty verdict. Given that there was no constitutional violation, the court dismissed the indemnification claim against the City of Joliet. *Id.*

## <u>SUMMARY OF THE ARGUMENT</u>

The trial court's entry of judgment for all Defendants should be upheld in its entirety.

Summary judgment as to Defendant Schumacher should be affirmed because the trial court properly found that Defendant Schumacher did not deliberately falsify

his police report in bad faith. The evidence proves, and Plaintiff admits, that the underlying information in the police report is true. The police report states:

> On 05/22/09 at approximately 1500 hrs I had the following conversation with Jesus Zambrano **in essence and not verbatim…**
>
> Zambrano asked me why we wanted to speak with him and I advised him that his name had come up in an investigation and I asked him where he was last night. **Zambrano stated to me that he was with his friends, PEDRO, and MICHAEL**. (It should be noted Pedro Sanchez and Michael Ortiz were present at the Zambrano's residence when we made contact with Zambrano and his mother). **Zambrano stated to me that he, Pedro, and Michael had gone to a girl's house by the name of CLAUDIA**. (emphasis added)

SOF, ¶ 37 and Exhibit B.

At the time Defendant Schumacher authored this police report – May 23, 2009 at 2:35 a.m. – the evidence establishes that based on his investigation, he reasonably believed that Plaintiff was with his friends, Michael Ortiz and Pedro Sanchez at his girlfriend, Claudia Sanchez's house hours before the murder. His investigation included interviewing Claudia Sanchez, Latonya Ortiz, Michael Ortiz, and Christian Lopez, who all confirmed that Plaintiff was in fact with Michael Ortiz and Pedro Sanchez at Claudia's house hours before the murder. SOF, ¶¶ 15-17. While Plaintiff may deny telling Defendant Schumacher the exact names "Pedro" and Michael" he admits that he told Defendant Schumacher "I told him I was with my girl and a couple friends the night before." Ex. 79-1, 113: 8-9. Therefore, there is no evidence that Defendant Schumacher acted in bad faith when he wrote his police report.

Summary judgment as to Defendant Schumacher should also be affirmed because the trial court properly found that the alleged false police report was not used

against Plaintiff at his criminal trial and therefore, did not deprive him of due process. Here, the alleged false police report was not admitted into evidence, used to refresh Defendant Schumacher's recollections, nor was it even mentioned during Plaintiff's criminal trial. SOF, ¶ 52.

## STANDARD OF REVIEW

This Court reviews a trial court's summary judgment ruling *de novo*, interpreting the facts, and drawing all reasonable inferences in favor of the nonmoving party. *Turubchuk v. S. Illinois Asphalt Co., Inc.,* 958 F.3d 541, 548 (7th Cir. 2020).

## ARGUMENT

### I.   Summary Judgment Was Proper

Plaintiff challenges summary judgment on the fabrication of evidence and indemnification claims. *See* Brief for Plaintiff Appellant at 20, hereafter "P. Br." As discussed below, summary judgment was proper for these claims.

#### A.   The Trial Court Properly Granted Summary Judgment On Plaintiff's Fabrication Of Evidence Claim.

To state a fabrication of evidence claim, Plaintiff must establish that: (1) Defendant Schumacher deliberately falsified evidence in bad faith; (2) the evidence was used at his criminal trial; (3) the evidence was material; and (4) plaintiff was damaged as a result. *Brown v. City of Chicago,* 2022 WL 4602714, at *21 (N.D. Ill. 2022). "The essence of a due process evidence fabrication claim is that the accused was convicted and imprisoned based on knowingly falsified evidence, violating his

right to a fair trial and thus depriving him of liberty without due process." *Patrick v. City of Chicago*, 974 F.3d 824, 835 (7th Cir. 2020).

Plaintiff's claim fails as a matter of law because: (1) Plaintiff cannot establish that Defendant Schumacher deliberately falsified his police report; (2) the police report was not used against Plaintiff during his criminal trial; and (3) Defendant Schumacher's alleged false police report did not have a material impact on the jury's guilty verdict.

i.    **Defendant Schumacher Did Not Deliberately Create His Police Report In Bad Faith Because All the Underlying Factual Information In His Police Report Is True.**

This Court should affirm the summary judgment ruling because Plaintiff fails to create a genuine issue of material fact that Defendant Schumacher deliberately falsified his police report. Plaintiff must "offer sufficient evidence from which a reasonable jury could find that the Individual Defendants knew the evidence they were eliciting was false." *Brown,* 2022 WL 4602714, at *21; *also see Petty v. City of Chicago*, 754 F.3d 416, 423 (7th Cir. 2014) (the "hallmark of a fabrication case" is that an officer "manufactured evidence that they knew to be false.") A fabricated evidence claim requires more than incorrect or inaccurate information, rather Plaintiff must show that Defendant Schumacher lied on purpose. *Patrick,* 974 F.3d at 835 (7th Cir. 2020). "This is a high bar to clear." *Coleman v. City of Peoria, Illinois*, 925 F.3d 336, 344 (7th Cir. 2019).

Plaintiff concedes that all of the underlying factual information in Defendant Schumacher's police report is true. Plaintiff admits that he spoke with Detective

Schumacher on May 22, 2009, at approximately 3:00 p.m. outside his residence. ECF #87, ¶ 37. Plaintiff admits that on May 21, 2009, he was with Michael Ortiz and Pedro Sanchez at Claudia Sanchez's residence located near the area of Ruby St. and the westside of the Des Plaines River. ECF #87, ¶ 38. Therefore, there is no genuine issue of material fact that Plaintiff admits the underlying facts of the police report are true. Despite the underlying facts being true, Plaintiff argues that Defendant Schumacher deliberately fabricated his police report because he contends that he was not the one who told Defendant Schumacher specifically who he was with or where he was at on the day before the murder. According to Plaintiff, Defendant Schumacher must have got that information from someone else. As the trial court correctly ruled, "Zambrano misses the point. The accuracy of the report is important, but it is not the whole ballgame… The issue is not whether a reasonable jury could find that the police report contained inaccurate information. The issue is whether a reasonable jury could find that the officer prepared an inaccurate report deliberately." ECF #93, pg. 17.

As the trial court ruled, Plaintiff presents no evidence to establish that Defendant Schumacher lied on purpose in his police report. Instead, Defendants offered substantial evidence on why he did not deliberately falsify his police report. Here, the uncontroverted evidence proves that Defendant Schumacher spoke with Zambrano on May 22, 2009 at 2:25 p.m. in which he told Defendant Schumacher, "I told him I was with my girl and a couple friends the night before, and that was it." ECF #79-1, 113: 8-9. Importantly, it is undisputed that Michael Ortiz and Pedro Sanchez were at Zambrano's residence when Defendant Schumacher spoke with

Zambrano. ECF #87, ¶ 9. Two hours later, Defendant Schumacher spoke with Claudia Sanchez and Latoya Ortiz who both confirmed that Plaintiff was with Michael Ortiz and Pedro Sanchez at their residence at the time in question. ECF #87, ¶¶ 15-16. Even more, Claudia Sanchez and Latoya Ortiz positively identified Jesus Zambrano, Michael Ortiz and Pedro Sanchez as the individuals who were at their residence at the time in question through a photo lineup. *Id.* Defendant Schumacher then interviewed Christian Lopez – the prosecution's star witness – who also confirmed he was with Michael Ortiz and Pedro Sanchez at Claudia Sanchez's residence. ECF #87, ¶ 17. All three of these witnesses corroborated the same relevant facts, *i.e.*, that Plaintiff was with Michael Ortiz and Pedro Sanchez at Claudia Sanchez's house in the evening hours of May 21, 2009.

Following Defendant Schumacher's communications with these three witnesses, Defendant Schumacher then authored his police report on May 23, 2009 at 2:25 a.m. ECF #87, ¶ 37. Based on Defendant Schumacher's investigation and Zambrano's statement "I told him I was with my girl and a couple friends the night before," Defendant Schumacher authored the following police report:

> On 05/22/09 at approximately 1500 hrs I had the following conversation with Jesus Zambrano **in essence and not verbatim**.
>
> I advised Zambrano that he was not in custody and he was free to leave at any time at that point. I asked him if he would have a seat in the back of Sgt. Reid's unmarked squad car and he agreed to speak with me. At about that time, I reiterated to him again that he was not under arrest. Zambrano asked me why we wanted to speak with him and I advised him that his name had come up in an investigation and I asked him where he was last night. **Zambrano stated to me that he was with his friends, PEDRO and MICHAEL**. (It should be noted Pedro Sanchez and Michael Ortiz were present at the Zambrano's residence when we made

contact with Zambrano and his mother). **Zambrano stated to me that he, Pedro, and Michael had gone to a girl's house by the name of CLAUDIA who lived somewhere in the area of Ruby St. near the Westside of the Desplaines River**. Zambrano stated that he had several icehouse beers and had smoked some marijuana while at Claudia's house however he was not intoxicated. He stated that he and his friends had gone to Claudia's house and that they then returned to his house at 1025 N. Raynor.

ECF #79-2, at 433-434.

Plaintiff admitted to all the above facts and therefore, these facts are not fabricated or false. Plaintiff may deny telling Defendant Schumacher exactly the names of his "girl" or "couple friends" but that does not establish Defendant Schumacher acted in bad faith when he wrote his police report. Instead, it is perfectly reasonable that based on Defendant Schumacher's investigation, he reasoned that Plaintiff's "girl" was Claudia Sanchez and his "couple friends" were Michael Ortiz and Pedro Sanchez. *See Jones v. York*, 34 F.4th 550, 563 (7th Cir. 2022) (finding that an officer did not fabricate his police report because he "reasonably inferred that Jones had reported Onopa for theft" despite Jones' testimony that she never made such a report to the officer). Plaintiff presents no evidence, even circumstantial evidence, that at the time Defendant Schumacher wrote his police report, he did not reasonably believe that Plaintiff was with Michael Ortiz and Pedro Sanchez at Claudia Sanchez's house in the evening hours of May 21, 2009, which was true. Therefore, Plaintiff's argument that he did not tell Schumacher the exact names of who he was with or where he was at, does not establish that Defendant Schumacher manufactured his police report that he knew to be false.

    ii.   <u>Plaintiff's Fabrication Of Evidence Claim Fails Because Defendant</u>

## Schumacher's Police Report Was Not Used Against Him at Trial

Arguendo, even if this Court holds that Defendant Schumacher deliberately falsified his police report, which Defendants deny is possible, this Court should still affirm the trial court's ruling because the false police report was not actually used against him during his criminal trial. In *Patrick v. City of Chicago*, 974 F.3d 824, 835 (7th Cir. 2020), this Court ruled against a trial court's jury instruction stating that "evidence was used to deprive Plaintiff of his liberty in some way was incomplete in that it failed to explain that plaintiff had the burden to prove that the fabricated evidence was used against him at his criminal trial and was material." Thus, to prove a fabrication of evidence claim under the Fourteenth Amendment, Plaintiff cannot simply show that Defendant Schumacher's police report deprived him in some way, rather, Plaintiff must show that the police report was used against him at his criminal trial. *Id.*

Guided by the Court's holding in *Patrick,* Chief Judge Pallmeyer issued an opinion in *Brown v. City of Chicago*, No. 2022 WL 4602714, at *23 (N.D. Ill. 2022) that is directly on point to this matter. There, plaintiff alleged that three detectives created false police reports who then testified consistent with those false reports at trial. *Id.* Plaintiff argued that even though the police reports were not admitted into evidence, the reports still deprived him of his liberty because the officers testified consistent with those reports, which the jury used to convict him. *Id.* The Court rejected that argument stating that the false police reports were not used against him during his trials. *Id.* There, neither report was introduced at his trials, and neither

report was used to refresh a witness's recollection during either trial. *Id.* The Court held that plaintiff's fabrication of evidence claims failed because he did not establish that the alleged false police reports were used against him at trial. *Id.; also see Mack v. City of Chicago,* 2023 WL 4744791, at *14 (N.D. Ill. 2023) (plaintiff's "fabrication claim as it applies to the police reports fares no better. None of the reports were introduced or used to refresh recollection during Mack's criminal trial and therefore none were 'used' at a criminal trial.")

The trial court correctly ruled that this case is analogous to *Brown v. City of Chicago,* because Defendant Schumacher's police report was not used against Plaintiff during his first criminal trial when it was not admitted into evidence, not used to refresh Defendant Schumacher's testimony nor was it even mentioned. ECF #93, pg. 19. The trial court also correctly rejected Plaintiff's argument, which he makes again here that the police report was "used" against him at his criminal trial because ASA Walsh used it to prepare Defendant Schumacher for his trial testimony. *Id.* This Court's decision in *Jones v. York*, rejects this argument because Defendant Schumacher is entitled to absolute immunity for his preparation of trial testimony. *Jones,* 34 F.4th at 563.

Plaintiff's reliance on *Avery v. City of Milwaukee*, 847 F.3d 433 (7th Cir. 2017) is misplaced. In *Avery,* the plaintiff alleged that detectives violated his due-process rights when their fabricated police reports were admitted into evidence during his criminal trial that resulted in his conviction. *Id.* at 437. There, plaintiff alleged that the detectives fabricated their police reports because he never admitted to murdering

the female defendant. *Id.* At trial, these detectives testified at trial and of relevance here, their police reports were admitted into evidence, therein establishing that plaintiff confessed to murdering the female defendant. *Id.* The Court found that plaintiff did state a fabrication of evidence claim because once the false evidence – the police reports – was introduced at trial, "it was entirely foreseeable that this fabricated 'evidence' would be used to convict Avery at trial for Griffin's murder." *Id.* 443. Thus, it was the admission of the fabricated evidence that deprived Plaintiff of due process during his criminal trial. *Id.* "After all, it was the admission of the false confession that made Avery's trial unfair." *Id.* at 442.

Unlike *Avery,* Defendant Schumacher's police report was never admitted into evidence, nor was it even mentioned during Plaintiff's criminal trial. Unlike *Avery,* it was not foreseeable that the alleged false evidence – Schumacher's police report – would be used to convict the Plaintiff because the jury did not even know of its existence. Thus, since Defendant Schumacher's police report was not admitted nor mentioned during Plaintiff's criminal trial, he was not deprived of any due process.

Here, the trial court gave Plaintiff the opportunity to establish how Defendant Schumacher's police report was used against him at the criminal trial or "got the ball rolling toward prosecution." Based on all the discovery, Plaintiff came up empty. According to Plaintiff's brief, police reports can be used against an individual based on the "prosecutors opening statement and closing arguments, they refresh the recollections of police officers…. and they are used to prepare police officers to testify." P. Br. at pg. 17. Plaintiff's appeal relies on the latter evidence because he concedes

that Defendant Schumacher's trial testimony and police report were not used during opening/closing arguments and not used to refresh his recollection. ECF #87, ¶ 52. There is no evidence that Defendant Schumacher's police report had any impact on Plaintiff's prosecution and Plaintiff does not offer any argument to the contrary. Instead, Defendant Schumacher's alleged false police report did not provide the Will County State's Attorney's Office with probable cause to obtain Jesus Zambrano's arrest warrant for the murder of Robert Gooch because his police report fails to put Zambrano at the scene of the murder. ECF #79, ¶ 30. In fact, Defendant Schumacher did not even testify during Zambrano's grand jury proceedings. ECF #79, ¶ 29. Defendant Schumacher's alleged false police report did not "get the ball rolling" towards prosecution because it does not even support probable cause for Plaintiff's arrest on the charge of murder. *See Massey v. Ojaniit*, 759 F.3d 343, 357 (4th Cir. 2014) (affirming dismissal of fabrication of evidence claim where police officers alleged false statements did not establish probable cause because of strength of remaining evidence).

Plaintiff's speculation that Defendant Schumacher's police report had an impact on his criminal trial based on ASA Walsh's testimony fails because it is not sufficient to establish a genuine issue of material fact. *See Liu v. T & H Machine, Inc.*, 191 F.3d 790, 796 (7th Cir.1999) (a party must present more than mere speculation or conjecture to defeat a summary judgment motion). Here, Plaintiff argues that ASA Walsh "testified at his deposition that the information that Patrick Schumacher put in his report and whatever Schumacher told him before he testified

is the information he used and was guided by when presenting Schumacher's testimony." P. Br. at pg. 18. As discussed above, whatever ASA Walsh did or did not do in preparing Defendant Schumacher for his trial testimony is not material because Schumacher is entitled to absolute immunity. *See Jones,* 34 F.4th at 563. Moreover, Plaintiff's overarching argument that ASA Walsh prepared Defendant Schumacher for his trial testimony is false. ASA Walsh did not prepare Defendant Schumacher for his trial testimony because he was not his witness. ECF #79-4, ¶ 8. Instead, ASA Trisha McKenna conducted Schumacher's direct examination because of his involvement with the GSR test, who Plaintiff did not depose. ECF #79-3, ¶ 33.

It is Plaintiff's burden to present evidence establishing a causal or nexus link between Defendant Schumacher's police report and Plaintiff's jury verdict, which he failed to do. Instead, Defendants offer uncontroverted evidence that Defendant Schumacher's police report did not "get the ball rolling" towards prosecution or used during his criminal trial. First, Schumacher's alleged false police report was not admitted or used in any way during either criminal trial. ECF #79, ¶ 52. Second, Defendant Schumacher's alleged false police report did not even provide the Will County State's Attorney's Office with probable cause to obtain Jesus Zambrano's arrest warrant for the murder of Robert Gooch because his police report fails to put Zambrano at the scene of the murder. ECF #79, ¶ 30. Finally, Defendant Schumacher did not even testify during Zambrano's grand jury proceedings. ECF #79, ¶ 29. Plaintiff has no admissible evidence that Defendant Schumacher's police report was used: (1) to obtain Plaintiff's arrest warrant; (2) during the grand jury proceedings;

and (3) during either criminal trial. As such, his speculative arguments as to what ASA Walsh did or did not do to prepare Defendant Schumacher for trial are not sufficient to establish a genuine issue of material fact.

### iii. Defendant Schumacher's Police Report Did Not Have a Material Impact on Plaintiff's Guilty Verdict.

Even if this Court holds that Defendant Schumacher deliberately falsified his police report that was used against him at trial, this Court should still grant summary judgment in Schumacher's favor because the police report did not have a material impact on his guilty verdict. The trial court did not address this argument on summary judgment, but this Court can still do so on appeal. *REXA, Inc. v. Chester*, 42 F.4th 652, 662 (7th Cir. 2022); *Fabiano v. City of Palos Hills*, 336 Ill. App. 3d 635, 652, 784 N.E.2d 258, 274 (2002).

To prevail on a fabrication of evidence claim, the fabricated evidence must be "material" meaning "there is a reasonable likelihood the evidence affected the judgment of the jury." *Patrick,* 974 F.3d at 835 (7th Cir. 2020). "The mere possibility that an item of evidence may have helped a defendant during his trial on criminal charges does not establish materiality." *Holland v. City of Chicago*, 643 F.3d 248, 256 (7th Cir. 2011).

In *Holland v. City of Chicago,* 643 F.3d 248, 250 (7th Cir. 2011) the court discussed the materiality of withheld evidence on a jury conviction. There, plaintiff was arrested and charged with sexually assaulting a female. Immediately after the assault, the female gave the city officers a description of the assailant as a man who

wore jeans with "cartoons" on them and dropped a knife in a nearby alley. *Id.* at 251. The city officers located the alley and found the plaintiff near a trashcan holding a pair of jeans with cartoons on them. *Id.* The city officers then showed a picture of plaintiff to the female and asked her if this was her attacker. *Id.* Initially, the female told the officers at least three times "no" that was not her attacker. *Id.* Thereafter, a female officer told the female that she was in good hands and that the "rapist couldn't hurt her anymore." *Id.* at 252. Then the female finally identified plaintiff as her attacker. *Id.* Plaintiff was tried and convicted based on the female's identification that included the "cartoon" pants description. *Id.* Plaintiff's conviction was later overturned when DNA evidence established that it was plaintiff's uncle who sexually assaulted the female. *Id.* at 250. Plaintiff filed a lawsuit alleging in part that the female officer "urged, coaxed, or pressured" the female into identifying plaintiff as her attacker. *Id.* The sole question before the court was whether the alleged officer's conduct, if true, had a material impact on the plaintiff's jury conviction. *Id.* The Court held that the alleged officer's conduct did not because of the following other strong pieces of physical evidence: (1) unique "cartoon" jeans; and (2) Plaintiff's proximity to the assault in a nearby alley — that resolved any doubt of Plaintiff's guilt. *Id.* at 256. Thus, even if the female officer coerced the statement, it did not have a material impact because of the strong pieces of physical evidence. *See Beaman v. Freesmeyer,* 776 F.3d 500 (7th Cir. 2015) (polygraph report was not material in light of a strong alibi defense); *Smith v. Almada,* 640 F.3d 931, 939 (9th Cir. 2011) (police officer's omission of suspect descriptions would not have created "a reasonable probability of

a different result" and hence was not material).

Not only did Defendant Schumacher's alleged false statements not have any impact on the decision to prosecute Plaintiff, like *Holland,* it also was not material to the jury's guilty verdict. First, the prosecution called Defendant Schumacher as a witness because of his involvement with performing the GSR test. ECF #79, ¶ 48. A GSR test detects the presence of distinctive chemicals that are deposited on a person's skin or clothing when a gun is fired. *Id.* During the trial, Defendant Schumacher testified that he attempted to perform a GSR test on Jesus Zambrano and Christian Lopez. ECF #79, ¶ 49. However, instead of using a GSR kit, Schumacher used a fingernail swabbing kit. *Id.* As a result, Schumacher did not obtain a sample from either Zambrano or Lopez because he used the wrong testing kit. *Id.* Defendant Schumacher's testimony related to the GSR test helped refute Zambrano's counsel's argument that the Joliet Police Department did not perform a GSR test. As a result, Defendant Schumacher's statements as to his conversation with Plaintiff were background information that was not intended, nor used to influence the jury's guilty verdict.

Moreover, like *Holland,* Defendant Schumacher's alleged false police report did not have a material impact on Plaintiff's jury conviction because there were numerous other pieces of material evidence that put Plaintiff closer in time to the murder than Defendant Schumacher's testimony. For example, the People admitted into evidence the surveillance video from the McDonald's drive through which clearly depicted Plaintiff as the driver of the gray cutlass vehicle at approximately 12:40 a.m., which

was just fifteen minutes before the murder. ECF #79, ¶ 54. Additionally, the People admitted into evidence the video surveillance from Larkin Apartments where the murder took place. ECF #79, ¶ 55. This video showed the same gray cutlass vehicle arriving and leaving the scene of the murder. Importantly, the time stamps of these videos established that the gray cutlass arrived at 12:47 a.m. and left Larkin apartments at 12:54 a.m., which was during the time of the murder. *Id.*

The Larkin Apartments surveillance video was a critical piece of evidence because it depicted the driver of the gray cutlass, who was wearing the same clothes as Plaintiff in the McDonald's video, open the hood of the gray cutlass and take what appeared to be a gun out of the vehicle and place it in his waistband. ECF #79, ¶ 56. This video further depicts the driver of the gray cutlass entering Larkin Apartments with the alleged handgun where the murder took place. *Id.* The video further depicts the driver of the gray cutlass running out of Larkin Apartments, leaving the murder scene, and placing the alleged handgun back into the hood of said vehicle. *Id.* The People called Joliet Police Department Computer Forensic Examiner, Christopher Botzum who testified using scientific analysis that the gray cutlass in the McDonald's surveillance video was the same gray cutlass in the Larkin Apartment surveillance video. ECF #79, ¶ 59.

Another material piece of evidence in Plaintiff's conviction was the testimony of Christian Lopez. ECF #79, ¶ 57. Lopez was the only eyewitness that corroborated the video evidence that confirmed Plaintiff was the driver of the gray cutlass and that he was the one who murdered Robert Gooch. *Id.* First, Lopez confirmed Defendant

Schumacher's testimony that he was with Plaintiff, Pedro Sanchez, and Michael Ortiz at Claudia's house where they were drinking and smoking marijuana. ECF #79, ¶ 17. Detective Schott also testified during Plaintiff's criminal trial that during his conversation with Lopez, Lopez confirmed that he was with Plaintiff, Pedro Sanchez, and Michael Ortiz at Claudia's house where they were drinking and smoking marijuana. ECF #79, ¶ 58. Lopez further testified that after Claudia Sanchez's residence, Plaintiff drove him, Pedro Sanchez and Michael Ortiz to McDonald's and then went to Larkin Apartments. ECF #79, ¶ 18. While at Larkin Apartments, Lopez testified that he observed Plaintiff retrieve a gun from the hood of the car where he, along with Lopez and Sanchez proceeded to go into the apartment complex. ECF #79, ¶ 19. Lopez testified that Plaintiff and Sanchez went up the stairs to the third floor of the apartment complex, but he stayed at the bottom of the stairs. *Id.* Lopez testified that the next thing he heard was a gunshot and saw Plaintiff and Sanchez run downstairs to the car. *Id.* Lopez then stated that Plaintiff put the gun back into the hood of the vehicle and drove everyone back to Plaintiff's house where they spent the night. *Id.* Without Lopez's testimony, the police did not have probable cause for an arrest warrant, and ultimately the prosecution could not have obtained a guilty verdict against Plaintiff for the murder of Robert Gooch. ECF #79-3, ¶ 23; ECF #79, ¶ 18.

Another critical piece of evidence was the testimony of Texas State Trooper Jon Lantz because he confirmed the People's theme of the case, which was that guilty people, like Plaintiff, flee and alter their appearance/identity. ECF #79, ¶ 60. On May

26, 2009, Joliet Police Officers went to Plaintiff's home to arrest him, but he was not there. ECF #79, ¶ 31. Instead, the officers spoke with Norma Zambrano – Plaintiff's Mother - who assured the officers that Plaintiff would turn himself in. *Id.* Instead, on or around May 27, 2009, the Joliet Police Department were notified that Plaintiff, Norma Zambrano and his Grandma fled the residence in a red vehicle. ECF #79, ¶ 32. As a result, the Joliet Police Department entered the red vehicle into a data base that allowed all officers within the United States to be on the lookout ("BOLO") for said vehicle. *Id.* Trooper Lantz testified that on May 28, 2009, he saw the car matching the vehicle in question and pulled it over. ECF #79, ¶ 33. In the car were two females and one male occupant. *Id.* The male occupant shaved his head and did not have any identification. ECF #79, ¶ 34. Trooper Lantz requested the male occupants name, who then stated that his name was "Juan." *Id.* Trooper Lantz testified that this male occupant was none other than the Plaintiff. ECF #79, ¶ 35. Trooper Lantz testimony was also supported with his police car video surveillance. ECF #79, ¶ 47.

Additional evidence supports the fact that Defendant Schumacher's testimony was not material to the jury's verdict. ASA Walsh and Plaintiff's counsel – Charles Bretz – did not rely on Defendant Schumacher's testimony during opening or closing arguments. ECF #79, ¶ 61. During jury deliberations, the jury never requested any additional information regarding Defendant Schumacher's testimony and instead requested the following pieces of material evidence:

  a. McDonald's surveillance video
  b. Larkin Apartments surveillance videos

      c.   Result of the Sanchez trial

      d.   All photographs

ECF #79, ¶ 63. Moreover, during a post-trial motion, Plaintiff's counsel argued for a new trial stating that:

"[w]hat they did is to go through this frame by frame and back and forth and what the gentleman told me is they saw shadows and things that they were not able to see in Court and **that was a primary factor in making their decision**." (Plaintiff's counsel was referring to the Larkin Apartments surveillance video). ECF #79, ¶ 65.

The "gentleman" Mr. Bretz referred to was a jury member during Zambrano criminal trial who he allegedly spoke with following the trial. *Id.*

Furthermore, the Illinois Appellate Court's decision to reverse and remand Plaintiff's conviction further supports that Defendant Schumacher's alleged false police report was not material to Plaintiff's jury conviction. There, Plaintiff appealed his guilty verdict arguing that: (1) his counsel failed to impeach Lopez with evidence that he received immunity to testify; and (2) failed to tender a jury instruction for accomplice liability. ECF #79, ¶ 66. Importantly, Plaintiff did not argue on appeal that Detective Schumacher gave false testimony and/or created a false police report that was material to the jury's improper guilty verdict. ECF #79, ¶ 67. The Appellate Court reversed and remanded Plaintiff's conviction because of his counsel's "failure to submit an instruction on accomplice testimony prejudiced Zambrano by depriving the jury of critical information it needed to evaluate Lopez's testimony." ECF #79, ¶ 68. Thus, the Appellate Court's ruling had nothing to do with Defendant Schumacher's alleged false police report.

Finally, when both criminal trials are compared, it provides further evidence that Defendant Schumacher's supposed false police report and testimony did not have a material impact on either verdict. This is so because Defendant Schumacher's testimony at both criminal trials remained the same. ECF #79, ¶¶ 50, 72. Additionally, the witnesses and exhibits remained virtually the same.[1] ECF #79, ¶¶ 45-47, 71-75. The main difference between the criminal trials was a result of the Illinois Appellate Court's decision that allowed Plaintiff to introduce an accomplice liability jury instruction and impeach the People's star witness, Christian Lopez based on his immunity to testify. Simply put, Plaintiff's counsel, who was the same in both criminal trials, got a second bite at the apple and did a much better job of destroying the credibility of Lopez who was the only eyewitness to the murder. *Compare* Lopez testimony in first trial, ECF #79-5. pgs. 275-347 to the second trial ECF #79-6, pgs. 203-264.

In sum, Plaintiff has not offered any evidence to establish that Defendant Schumacher's alleged false police report had a material impact on his guilty verdict. Instead, Plaintiff was convicted based on the following material evidence, which Plaintiff admits:

- People's Exhibit 3 – Surveillance video of Larkin Apartments
- People's Exhibit 4 – Surveillance video of McDonald's
- People's Exhibit 14 – Trooper Lantz's Traffic Stop
- Defense Exhibit 3 - Surveillance video of Larkin Apartments

ECF #87, pgs. 11-12. Additionally, according to ASA Walsh, the following

---

[1] In Plaintiff's second criminal trial, his counsel effectively introduced a new Exhibit, Plaintiff's Hufford Junior High Yearbook into evidence to rebut Lopez's testimony that he barely knew Plaintiff and was not that close with him.

additional evidence was critical in obtaining Plaintiff's guilty verdict.

- Surveillance video of McDonald's because it depicted Plaintiff as the driver of the gray cutlass at approximately 12:40 a.m., which was fifteen minutes before the murder.

- Surveillance video of Larkin Apartments depicted the same gray cutlass, as confirmed by forensic expert Christopher Botzum, arriving and leaving the scene of the murder during the relevant time period. Additionally, this video depicts the driver of the cutlass (Plaintiff) take what appeared to be a gun out of the hood, go into the Larkin Apartments and is seen running from the murder scene.

- Testimony from Christopher Lopez who was an eyewitness to the murder.

- Testimony from Trooper Lantz who testified that he arrested Plaintiff 29 miles from the Mexico border. Trooper Lantz testified that Zambrano altered his appearance by shaving his head, did not have any identification on him, and lied to Trooper Lantz when Plaintiff said his name was "Juan."

ECF #79-4, ¶¶ 13-21. Given the above, Defendant Schumacher's alleged false police report could not have impacted the jury's guilty verdict in light of the overwhelming evidence of his guilt and cumulative nature of his testimony with Detective Schott and Christian Lopez. *See U.S. ex rel. Coleman v. Shaw,* 2009 WL 1904370, at *12 (N.D. Ill. July 1, 2009), aff'd sub nom. *Coleman v. Hardy*, 690 F.3d 811 (7th Cir. 2012) (testimony that "did not touch on petitioner's volitional acts that supported the murder charge", even if false, had no effect on the jury's verdict); *Tayborn v. Scott*, 251 F.3d 1125, 1131 (7th Cir. 2001) (testimony, even if false, would not have impacted the jury's verdict because the testimony was cumulative of the prosecution's star witness).

**B.      Given That There Is No Underlying Constitutional Violation, Plaintiff's Indemnification Claim Against the City of Joliet Fails.**

Count II alleges indemnification against the City of Joliet, which is not an independent cause of action, but a request for relief from the City, should Defendant Schumacher be found liable on Plaintiff's fabrication of evidence claim. Given that the trial court correctly granted summary judgment as to Defendant Schumacher, this Court should likewise affirm summary judgment as to the City of Joliet

## CONCLUSION

WHEREFORE, for the forgoing reasons, Defendants respectfully request that this Court affirm the trial court's grant of summary judgment to Defendants on Plaintiff's fabrication of evidence and indemnification claims and award Defendants for such other relief as this Court deems just and proper.

September 9, 2024

Respectfully submitted,
*/s/ Darcy Proctor*

John O'Driscoll
Darcy Proctor
Andrew O'Donnell
TRESSLER LLP
233 S. Wacker Drive, 61st Floor
Chicago, IL 60606
312-627-4000
jodriscoll@tresslerllp.com
dproctor@tresslerllp.com
dodonnell@tresslerllp.com

## CERTIFICATE OF COMPLIANCE WITH F.R.A.P. 32(a)(7)

The undersigned counsel of record for the Defendants-Appellees, PATRICK SCHUMACHER, and THE CITY OF JOLIET, furnishes the following in compliance with F.R.A.P. Rule 32(a)(7):

I hereby certify that this brief conforms to the rules contained in F.R.A.P. Rule 32(a)(7) for a brief produced with proportionally spaced font. The length of this brief is **8,956** words, verified with the "word count" function of Microsoft Word 2010, inclusive of all main text and footnotes and excluding all parts of the brief excluded by F.R.A.P. 32(a)(f)

This brief also complies with the typeface requirements of F.R.A.P. 32(a)(5) and the style requirements of F.R.A.P. 32(a)(6) because it has been prepared using a proportionally spaced typeface (Century) in 12-point type for the text.

By: */s/ Andrew O'Donnell* _____

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned, being first duly sworn on oath, deposes and says that a copy of APPELLEES BRIEF and was served on all attorneys of record via CM/ECF filing with the United States Court of Appeals for the Seventh Circuit on September 9, 2024.

By:   */s/ Andrew O'Donnell*